OWEN, Circuit Judge.
Luis Gerard Cervantes appeals his conviction on the ground that the Border Patrol agents who conducted the traffic stop that led to his arrest lacked reasonable suspicion and violated the Fourth Amendment. The district court denied Cervantes’s motion to suppress. We affirm.
I
The relevant facts are not in dispute. On a Wednesday in early October, at approximately 8:30 a.m., Cervantes was driving a Chevrolet Trailblazer eastbound on Interstate 20 (1-20) near Odessa, Texas, with five passengers. That morning, Border Patrol Agents David Collier and Carlos Ramirez were on roving patrol and had parked in the median of 1-20 when Cervantes’s vehicle passed them. Collier noticed that the Trailblazer was sagging in the rear or perhaps overloaded, and both agents noticed that the vehicle had multiple occupants. The agents decided to investigate further.
*328 As the agents neared Cervantes, he switched from the left lane to the right lane and began traveling behind an eighteen-wheeler semi-truck that was being driven about ten to fifteen miles under the seventy-five-miles-per-hour speed limit. The agents considered this odd behavior because there were no vehicles in the left lane ahead of the Trailblazer when it slowed its speed and pulled behind the eighteen-wheeler. As the . agents approached Cervantes’s vehicle, they saw that a passenger was in the rear cargo area of the vehicle where there was no seat. They then checked the vehicle’s records and learned that it was registered in Morton, Texas, a town north of Odessa. The agents drove their patrol car parallel to Cervantes’s and observed that the rear passengers were “dirty” and did not appear to have shaved or bathed in several days, while the driver and front passenger appeared “clean.” Ramirez also noticed that the rear passengers were wearing dirty jackets and heavy clothing while the front passenger and Cervantes were wearing short sleeves. The agents themselves were attired in short sleeves, which they considered appropriate for the weather that day. While driving next to Cervantes’s vehicle, the agents honked six times. Cervantes did not respond to the honking but looked forward and kept his hands tightly on the steering wheel. Neither Cervantes nor his front-seat passenger looked in the direction of the agents’ vehicle despite the agents’ attempts to obtain their attention.
Collier and Ramirez conducted a traffic stop. As Officer Collier approached the Trailblazer, he saw burlap backpacks, one of which was torn, and he saw small brick bundles wrapped with brown tape. These bundles were consistent with the way in which illegal drugs were often packaged and smuggled, and he believed the bundles contained marijuana. Ultimately, it was determined that approximately 170 pounds of marijuana in the backpacks that had been carried across the border by the rear passengers. Cervantes and all of the passengers were arrested and charged with aiding and abetting possession with intent to distribute marijuana.
Cervantes filed a motion to suppress alleging he was stopped without reasonable suspicion in violation of the Fourth Amendment. After a hearing, the district court denied the motion. Cervantes entered a conditional guilty plea and reserved his right to appeal the ruling on his motion to suppress. The district court sentenced Cervantes to fifty-one months in prison and three years of supervised release. Cervantes appeals the denial of his motion to suppress.
II
In reviewing the district court’s disposition of the motion to suppress, we review legal conclusions de novo, including the conclusion that Collier and Ramirez had reasonable suspicion to stop Cervantes, and factual findings for clear error.[1] We view the evidence presented at a pretrial hearing on a motion to suppress in “the light most favorable to the prevailing party,” in this case the Government.[2]
III
Border Patrol agents on roving patrol “may detain vehicles for investiga *329 tion only if they are aware of specific, articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle is involved in illegal activities.”[3] We weigh the factors outlined by the Supreme Court in Bngnoni-Poncé[4] to determine if reasonable suspicion existed to stop a vehicle in a border area.[5] The factors that may be considered include:
(1) the area’s proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents’ experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior.[6]
We look to the totality of the circumstances, and not every factor must weigh in favor of reasonable suspicion for it to be present.[7] “Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers.” [8]
The Supreme Court has explained that evaluation of these “factors in isolation from each other does not take into account the ‘totality of the circumstances,’ as our cases have understood that phrase.”[9] The Supreme Court has rejected the proposition that if behavior was “itself readily susceptible to an innocent explanation [the behavior] was entitled to ‘no weight.’”[10] The Supreme Court has observed that
Terry ... precludes this sort of divide- and-conquer analysis. The officer in Terry observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was “perhaps innocent in itself,” we held that, taken together, they “warranted further investigation.” [11]
The Supreme Court held in United States v. Sokolow that factors which by themselves were “quite consistent with innocent travel” collectively amounted to reasonable suspicion.[12]
The agents encountered Cervantes’s vehicle near Penwell, Texas, on I-20 traveling east toward Odessa. In determining whether agents had reason to believe that the occupants of a vehicle had recently crossed the border, our court has said that proximity to the border is “a *330 paramount factor in determining reasonable suspicion,”[13] and when a stop takes place more than fifty miles from the border, “we look at the remaining factors most carefully to ensure the stop complied with the ... Fourth Amendment.”[14] The distance of this stop from the border between Mexico and the United States weighs against reasonable suspicion.
That the stop occurred more than fifty miles from the border is not dispositive, however.[15] We have said that “even where a vehicle is beyond the fifty mile benchmark, the fact that the northbound vehicle was traveling from the direction of the Mexico-United States border can be a legitimate factor when viewed in conjunction with other factors.”[16] There are other factors present in this case that support reasonable suspicion.
Though the point at which the vehicle was stopped was approximately 200 miles from the border between Mexico and Texas, the district court found that Interstate 20, on the west side of Odessa, where this stop occurred, “is well known for its prevalence of drug and alien smuggling.” The evidence in the record supports that finding. In addition, Officer Collier testified that he had made more than 100 stops in the area west of Odessa on Interstate 20 that had resulted in discovering undocumented aliens and illegal drugs on “regular occasions.”
Our court has also recognized that this portion of Interstate 20 is “a favored route for illegal alien smugglers.”[17] In another decision from this court, we recognized that there was evidence that the same location at which Cervantes was stopped, on Interstate 20 near Penwell, Texas, was “notorious for alien smuggling and narcotics.” [18]
In United States v. Orozco and United States v. Morales, this court determined that reasonable suspicion existed for stops on 1-20 near Penwell, Texas, where Cervantes was stopped. In Orozco, the driver was traveling eastbound on 1-20 at about 9:30 a.m. on a Sunday in a pick-up truck.[19] Orozco, the front passenger, was slumped over, and the driver was looking straight ahead.[20] The bed of the truck was covered with a blue tarp.[21] The truck was riding low and weaving back and forth on the *331 road.[22] The agent began following the truck, pulled up next to the truck, and honked his horn.[23] The driver did not look at the agent, although the agent was not sure if the driver heard the honking.[24] The agent noticed that the spare tire was in the backseat with a jacket draped over it, which indicated to the agent that there was something in the truck bed.[25] The agent testified that “he had stopped numerous loads of aliens on that stretch of road, generally between 9:00 and 10:00 in the morning.”[26]
The Orozco court stated that because the stop took place between 200-300 miles from the border, the proximity factor did not “cut[ ] in favor of a finding of reasonable suspicion.”[27] However, other factors weighed in favor of reasonable suspicion: (1) the area of 1-20 was known for smuggling, and the agent “had personally captured approximately 20 loads of aliens in the same area over the previous five month period”;[28] (2) the agent testified that “the majority of smugglers passed through that particular stretch of 1-20 on weekends between 9 and 10 a.m., the precise day and time in which Orozco’s pickup was traveling,” and Orozco was traveling eastbound, which was consistent with other smuggling loads;[29] and (3) the truck was heavily loaded and weaving; the truck bed was covered by a tarp, “a common technique employed by smugglers to hide illegal aliens,” and the spare tire was in the back seat.[30] It is unclear how much weight the court gave to Orozco’s behavior (slumping in his seat) or to the driver’s failure to acknowledge the agent after he honked, but these factors were part of the court’s analysis.[31] The court determined that, based on the totality of the circumstances, reasonable suspicion existed.[32]
In Morales, our court determined reasonable suspicion existed for a stop on I-20 near Penwell, Texas.[33] The court accorded weight in favor of reasonable suspicion to (1) the agent’s 28 years of experience and the fact that “[i]n the past year alone, [he] had detained approximately 600 illegal aliens on this stretch of the highway”; [34] (2) the pick-up truck had under-inflated tires and bounced as it passed over bumps in the road, indicating that it *332 was heavily loaded;[35] and (3) the track bed had a fiberglass cover.[36] The court mentioned the following facts, but it is. unclear if the court gave weight to them: (1) “[t]he majority of the smuggling detected by the Agent occurred between 9:30— 10:00 a.m.[, and the driver] passed by the Agent during that time period,”[37] and (2) the driver did a “doubletake” when he saw the agent’s marked vehicle, slowed down, and after the agent started following him, weaved back and forth on the road.[38]
Based ón the record in the present case, the factors other than proximity to the border weigh in favor of reasonable suspicion. Collier testified that Cervantes’s vehicle appeared to be sagging in the rear, and in his experience, that is indicative of narcotics smuggling because smuggling vehicles usually have multiple occupants. While Collier acknowledged that the vehicle did not show any indication that it had recently “gone off road,” and that he did not know if there was an alternative explanation for the vehicle riding low, such as the vehicle’s shocks were worn, given Collier’s field experience observing weighed-down vehicles, the fact that Cervantes’s vehicle was riding sagging in the rear is part of the totality of the circumstances that gave rise to reasonable suspicion.[39]
Collier testified that, by his estimate, when Cervantes passed the agents, Cervantes was traveling “at or approximately at highway speeds.” As the agents neared Cervantes, although there were no vehicles *333 in front of him or attempting to pass him, Cervantes quickly switched from the left lane to the right lane and pulled behind a semi-truck that was traveling about ten to fifteen miles under the speed limit. Collier stated that, while not illegal, this type of driving behavior was consistent with other smuggling loads he had seen, and it was particularly significant because Cervantes had time to pass the semi-truck but instead chose to follow very close behind it. While driving parallel to Cervantes’s vehicle in their marked Border Patrol vehicle, the agents honked six times. Ramirez testified that Cervantes had to know they were Border Patrol agents because Cervantes had passed them when they were parked in the median. During this time, Cervantes looked forward and kept his hands tightly on the steering wheel.
Collier stated that he had not used the honking technique many times before, so he did not opine as to whether it was normal for Cervantes to continue looking forward. Collier conceded that it was safe for Cervantes to keep his eyes on the road, but Ramirez testified the lack of eye contact indicated to him that the occupants wanted' to “shield the[m]selves from us.” Collier further testified that while semi-trucks often travel below the speed limit, it was suspicious that Cervantes began traveling below the speed limit. Cervantes’s decision to decelerate and pull behind the semi-truck as the agents neared his vehicle even though no other vehicles were near him[40] and his failure to acknowledge the *334 agents’ presence after the honking[41] are entitled to some weight in favor of reasonable suspicion.
In addition to Cervantes, there were five passengers in the Trailblazer: one in the front passenger seat, three in the back seat, and one in the rear cargo area. The passenger in the front seat was female, and the rest were males. The agents testified that it is not uncommon to see a vehicle with multiple occupants on 1-20; however, multiple passengers were usually seen in vehicles that were used in an oilfield business. Those vehicles were usual *335 ly flatbed, dually or pickup trucks, generally with lettering on the side, big diesel tanks, racks, tool boxes or brush guards attached. The Trailblazer, a small sport utility vehicle (SUV), had none of these features. While Ramirez agreed that if there were a fifth passenger in Cervantes’s vehicle, the only space for him would be in the rear cargo area, the agents testified it is very uncommon to see a passenger in the cargo area of a passenger vehicle, such as a Trailblazer, where there is no seat or seatbelt. The agents further stated that such a seating arrangement is consistent with smuggling. Collier additionally testified that a vehicle with multiple occupants is typical for narcotics smuggling. While the fact that a vehicle had multiple occupants is not necessarily suspicious,[42] the travelers’ positions in this vehicle are a consideration supporting the agents’ stop of the vehicle.[43]
Regarding their appearance, the front passenger was wearing short sleeves and appeared “clean,” while the rear passengers wore heavy clothing and jackets and appeared “dirty, [like] they just came off the brush.” The rear passengers appeared to have not bathed or shaved in several days. It was 8:30 in the morning when the stop occurred and therefore unlikely that the rear passengers’ appearance was due to working outdoors that day. Ramirez stated that at the time of the stop, he was wearing short sleeves, and short sleeves were more appropriate for the temperature that day than the rear passengers’ clothing. He testified that immigrants who had been in the brush crossing the border often worn a jacket for protection against the brush and thorns and for warmth during the cool nights. He had observed that type of dress on many occasions when undocumented aliens were encountered. As to why the back passengers had jackets while inside the vehicle but the driver and front passenger did not, Ramirez agreed that individuals respond to temperature differently, and he did not know the temperature inside Cervantes’s vehicle but expressed some doubt that there could be different temperatures of that magnitude in a small SUV. He also testified that all the passengers appeared to be Hispanic. The evidence regarding the rear passengers’ attire in conjunction with the time of day and the noticeable difference in appearance and dress between the rear passengers and the front passenger are also part of the totality of the circumstances that gave rise to reasonable suspicion.[44]
*336 The agents testified that 1-20 has “heavy traffic coming from the south” and that they patrol 1-20 frequently based on their knowledge that “alien and narcotic loads are entering from the south and ... [I-20]’s a good highway that leads up to Odessa and north.” As we have noted, I-20’s reputation as a smuggling route weighs in favor of reasonable suspicion.[45] Additionally, at the time of the suppression hearing, Collier had over sixteen years of experience as a Border Patrol agent, ten of which were spent in the Midland area, and Ramirez had eleven years of experience, three of which were spent in the Midland area. The agents testified that their main duty is traffic observation and that they often watch traffic on 1-20. Their substantial experience is a factor weighing in favor of reasonable suspicion, in light of what they observed.[46]
Cervantes points to other evidence that he contends require us to conclude that the agents had no reasonable suspicion when they stopped his Trailblazer. Collier testified that people drive to their jobs in Odessa in the mornings and that traffic is heavy at those times. The agents did not *337 testify that this time or day of the week had any particular significance to them,[47] and there is nothing inherently unusual about traveling on a major thoroughfare on a weekday morning.[48]
Collier testified that Cervantes’s vehicle was registered in Morton, Texas, approximately 135 miles north of Odessa. There are highways that connect Odessa to Morton. “A vehicle’s registration may, under some circumstances, add to reasonable suspicion,”[49] and here, the facts were consistent with traveling to Morton.[50] The agents also testified that the decision to pull Cervantes over was not based on a tip or information from an informant. Although Collier had performed numerous traffic stops in the area, he could not recall exactly how many recent arrests he had made, and Ramirez stated that he could recall making one arrest in the months preceding Cervantes’s arrest. We have said that the lack of a tip or information about recent illegal trafficking in the area detracts from reasonable suspicion.[51]
The facts of the present case are similar, to some degree, to facts discussed in United States v. Olivares-Pacheco.[52] In that case, the Fifth Circuit determined no rea *338 sonable suspicion existed.[53] Like Cervantes, Olivares-Pacheco was traveling eastbound, in the right lane, on 1-20 near Odessa, Texas, on a weekday morning (10:30 a.m.).[54] Cervantes drove a Trailblazer, an SUV, while Olivares-Pacheco drove an extended-cab pick-up truck.[55] Both vehicles were registered in another area of Texas accessible from 1-20 or roads stemming from I-20.[56] Like Cervantes’s vehicle, there were six occupants in Olivares-Pacheco’s vehicle, but one of the passengers in Cervantes’s vehicle traveled in the rear cargo area where there was no seat.[57] Also unlike Cervantes, who decelerated when the agents began catching up to him, Olivares-Pacheco drove at the speed limit.[58] Neither Cervantes nor Olivares-Pacheco engaged in erratic driving behavior.[59] Olivares-Pacheco’s vehicle had brush underneath it, and Cervantes’s vehicle appeared to be riding low.[60] In both situations, the drivers did not acknowledge the agents’ presence when the agents pulled up next to their vehicles; in Cervantes’s situation, the agents also honked multiple times.[61] One of the passengers in Olivares-Pacheco’s vehicle pointed in the opposite direction of the agents, and the others looked that way.[62] The passengers in Cervantes’s vehicle were dirty and wearing jackets, while the front passenger and Cervantes were clean and in short sleeves.
In Olivares-Pacheco, this court determined reasonable suspicion did not exist for the stop.[63] The only factor the court considered as solidly weighing in favor of reasonable suspicion was the agents’ extensive experience.[64] The differences between Olivares-Pacheco and the present case are that: (1) Cervantes changed lanes and decelerated; (2) the rear passengers in Cervantes’s vehicle wore jackets, were dirty, appeared not to have shaven or bathed for days, and the time of the stop was inconsistent with returning from work; (3) one of the passengers was in the rear cargo area; (4) the agents honked at Cervantes, making his failure to acknowledge them more notable; and (5) Cervantes’s vehicle was riding low. While there is conflicting case law, support can be found as to the relevance of each of these factors, with the exception of the fact that the passengers wore jackets.[65] Both of the *339 agents who made the stop were experienced in apprehending alien smugglers, and the agents were personally familiar with the appearance of aliens who had emerged from brushy areas after crossing the border, including the types of clothing typically worn. The agents testified that the appearance of the passengers in Cervantes’s vehicle was entirely consistent with aliens who had crossed the border and traveled through the Texas brush. The experience of agents in circumstances such as these is entitled to weight.[66] There is evidence in the present, case that was not presented in Olivares-Pacheco. We must consider the totality of the circumstances that faced Agents Collier and Ramirez.
Viewing the evidence in the light most favorable to the Government,[67] and considering the totality of the circumstances,[68] the agents had reasonable suspicion to stop Cervantes. The traffic stop did not violate the Fourth Amendment.
* * *
For the aforementioned reasons, we AFFIRM the district court’s judgment.

. United States v. Garza, 727 F.3d 436, 440 (5th Cir.2013) (citing United States v. Rangel-Portillo, 586 F.3d 376, 379 (5th Cir.2009) and United States v. Rodriguez, 564 F.3d 735, 740 (5th Cir.2009)).

. Rodriguez, 564 F.3d at 740.

. Garza, 727 F.3d at 440 (quoting United States v. Cardona, 955 F.2d 976, 980 (5th Cir.1992)) (internal quotation marks omitted).

. United States v. Brignoni-Ponce, 422 U.S. 873, 884-85, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

. Garza, 727 F.3d at 440.

. United States v. Soto, 649 F.3d 406, 409 (5th Cir.2011) (citing United States v. Jacquinot, 258 F.3d 423, 427 (5th Cir.2001) (per curiam)).

. Garza, 727 F.3d at 440 (citing United States v. Zapata-Ibarra, 212 F.3d 877, 884 (5th Cir.2000) and United States v. Hernandez, 477 F.3d 210, 213 (5th Cir.2007)).

. United States v. Olivares-Pacheco, 633 F.3d 399, 402 (5th Cir.2011) (internal quotation marks omitted) (quoting Jacquinot, 258 F.3d at 427-28).

. United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

. Id.

. Id. (citing Terry v. Ohio, 392 U.S. 1, 9, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

. 490 U.S. 1, 7-8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

. United States v. Garza, 727 F.3d 436, 441 (5th Cir.2013) (quoting United States v. Zapata-Ibarra, 212 F.3d 877, 881 (5th Cir.2000)) (internal quotation marks omitted); see also id. ("[T]his Court has repeatedly emphasized that one of the vital elements in the Brignoni-Ponce reasonable suspicion test is whether the agents had reason to believe that the vehicle in question had recently crossed the border.” (alteration in original) (quoting United States v. Melendez-Gonzalez, 727 F.2d 407, 411 (5th Cir.1984))).

. United States v. Soto, 649 F.3d 406, 410 (5th Cir.2011) (quoting United States v. Orozco, 191 F.3d 578, 581 (5th Cir.1999)) (internal quotation marks omitted).

. See United States v. Varela-Andujo, 746 F.2d 1046, 1047 (5th Cir.1984) (determining reasonable suspicion existed even though the stop occurred over 170 miles from the Mexican border); United States v. Salazar-Martinez, 710 F.2d 1087, 1088 (5th Cir.1983) (determining reasonable suspicion existed even though the stop occurred 165 miles from the Texas-Mexico border).

. Soto, 649 F.3d at 410.

. Orozco, 191 F.3d at 582; see also United States v. Puac-Zamora, 56 F.3d 1385, 1385 (5th Cir.1995) (per curiam) (unpublished but precedential under 5th Cir. R. 47.5).

. United States v. Morales, 191 F.3d 602, 604 (5th Cir.1999).

. Orozco, 191 F.3d at 579-80.

. Id. at 580.

. Id.

. Id.

. Id.

. Id. at 580 & n. 2.

. Id. at 580.

. Id.

. Id. at 581.

. Id. at 582.

. Id.

. Id.

. Id. (' 'The trial judge noted that the 'driver’s i behavior’ in addition to agent Bollier’s obser- ■ vation that Orozco was 'trying to hide' were 'factors warranting Bollier’s continual pursuit ;'of the vehicle. Prior to stopping the truck, B oilier pulled next to the truck, rolled down his window to display his uniform and honked at the driver; however, this attempt to grab the driver’s attention failed — yet another sign that something was amiss. We have held that while slouching, alone, may not be a significant factor we look to overall behavior of the vehicle driver. Moreover the avoidance of eye contact may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior. Although some of the factors relied on by the trial judge would not alone amount to reasonable suspicion, reasonable suspicion determinations are not limited to analysis of one factor.” (citations omitted)).

. Id. at 583.

. United States v. Morales, 191 F.3d 602, 603 (5th Cir.1999).

. Id. at 604, 606.

. Id. at 605-07.

. Id. at 607.

. Id. at 605.

. Id.

. See United States v. Brignoni-Ponce, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (stating that whether a vehicle "appear[s] to be heavily loaded” is a factor to consider when determining reasonable suspicion); United States v. Olivares-Pacheco, 633 F.3d 399, 405 (5th Cir.2011) (determining reasonable suspicion did not exist for stop in which vehicle was "neither over- nor underloaded”); United States v. Guerrero-Barajas, 240 F.3d 428, 433 (5th Cir.2001) (according some weight to the fact that the vehicle was "riding low”); United States v. Ceniceros, 204 F.3d 581, 585 (5th Cir.2000) ("A vehicle's heavily-laden appearance may support a finding of reasonable suspicion and corroborate an informant's tip.”); United States v. Cardona, 955 F.2d 976, 981 (5th Cir.1992) (stating the fact that a vehicle is riding low "is a permissible factor for evaluation”); United States v. Garcia, 732 F.2d 1221, 1225 (5th Cir.1984) (determining reasonable suspicion existed and according some weight to fact that “the camper appeared heavily loaded”); United States v. Garza, 544 F.2d 222, 224-25 (5th Cir.1976) (per curiam) (determining reasonable suspicion existed for stop sixty-plus miles from the border in part because "the car appeared to be heavily loaded”); United States v. Lara, 517 F.2d 209, 210-11 (5th Cir.1975) (determining reasonable suspicion existed for stop approximately two miles from the border in part because the "vehicle was riding low and appeared to be heavily loaded”); cf. United States v. Moreno-Chaparro, 180 F.3d 629, 632-33 (5th Cir.1998) (determining reasonable suspicion did not exist for stop in part because "[t]he agent could not point to anything suspicious about the truck. It contained no visible passengers, it had not been modified in an obvious way, and it was not riding low to the ground”). But see United States v. Melendez-Gonzalez, 727 F.2d 407, 412 (5th Cir.1984) ("[E]ven if relevant, the fact that defendant’s car was supposedly ‘riding low’ has not been given determinative weight in border patrol cases.” (footnote omitted)); United States v. Orona-Sanchez, 648 F.2d 1039, 1040, 1042 (5th Cir. Unit A 1981) (determining reasonable suspicion did not exist for stop on “lightly traveled state roadway” approximately fifty miles from the border when, among other things, the vehicle was heavily loaded, and the driver "slowed down considerably” and began driving "somewhat erratically”); United States v. Pacheco, 617 F.2d 84, 86 (5th Cir.1980) (determining reasonable suspicion did not exist for stop and attributing "little weight” to fact that vehicle was riding low).

. See United States v. Neufeld-Neufeld, 338 F.3d 374, 377, 382 (5th Cir.2003) (according weight to the defendant’s considerable deceleration after seeing the marked patrol car, and the defendant did not appear to be speeding beforehand); United States v. Espinosa-Alvarado, 302 F.3d 304, 306-07 (5th Cir.2002) (per curiam) (according some weight to the driver’s behavior in response to the agents’ presence-"looking excessively in his mirrors and slowing the [vehicle] to 10 miles per hour below the speed limit’’); United States v. Jacquinot, 258 F.3d 423, 429 (5th Cir.2001) (per curiam) (“Although deceleration in the presence of a patrol car may be completely innocent behavior, this court has noted that such behavior may be suspicious if the driver was not speeding when first observed.” (citing United States v. Villalobos, 161 F.3d 285, 291 (5th Cir.1998))); Guerrero-Barajas, 240 F.3d at 433 (determining reasonable suspicion existed and according some weight to fact that “the driver slowed and began to swerve within his lane once the Agents began to follow him”); United States v. Zapata-Ibarra, 212 F.3d 877, 879, 882 (5th Cir.2000) (determining reasonable suspicion existed in part because the defendant was initially traveling at the speed limit and "decelerated considerably” when the agent neared the defendant’s vehicle); Morales, 191 F.3d at 605 (noting the defendant slowed down after passing by the marked patrol vehicle); Villalobos, 161 F.3d at 291 (determining reasonable suspicion existed for a stop in part because the vehicle “decelerated noticeably when Agent Hall pulled in front of [the driver], even though [the driver] had not been speeding” and “dropped back a full mile or more”); Cardona, 955 F.2d at 978, 981 (stating the defendant slowed down “considerably” after the agents began following him); cf. United States v. Arvizu, 534 U.S. 266, 275-76, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (stating "a driver’s slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer” may add to reasonable suspicion in some circumstances); Zapata-Ibarra, 212 F.3d at 882-83 ("[The driver’s] deceleration and swerving on a [two-lane] road at nighttime, in response to a rapidly accelerating vehicle with its high-beam lights on, weighs, at best, only slightly in favor of the reasonableness of [the agent’s] suspicions.”); United States v. Nichols, 142 F.3d 857, 866, 868 (5th Cir.1998) (taking into account fact that the driver "was traveling at an unusually slow speed”); Garcia, 732 F.2d at 1225 & n. 4 (determining reasonable suspicion existed and according some weight to "the unusually slow speed of [the] vehicle,” about forty to forty-five miles per hour on Interstate 35). But see Ceniceros, 204 F.3d at 583, 585 (determining reasonable suspicion existed and giving weight to the fact that the vehicle "drifted within its lane” but not to the fact that the vehicle’s "speed fluctuated between 55 and 70 miles per hour”); United *334 States v. Chavez-Villarreal, 3 F.3d 124, 126-27 (5th Cir.1993) (determining reasonable suspicion did not exist for stop roughly 350 miles from the border on Interstate 40: "We find nothing suspicious about a driver changing lanes and slowing down when he realizes a vehicle is approaching from the rear; that is a normal reaction if the driver wishes to let the tailing vehicle pass.”); United States v. Diaz, 977 F.2d 163, 164-65 (5th Cir.1992) (determining reasonable suspicion did not exist to stop vehicle that flashed high beams about twenty yards from the parked patrol vehicle and then "slowed from an estimated 75 to about 40 miles per hour” and specifically noting "there is nothing suspicious about a speeding car slowing down after a marked patrol unit turns to follow, with or without flashing lights.”).

. See United States v. Orozco, 191 F.3d 578, 582 (5th Cir.1999) (according, in case involving a stop on 1-20 near Odessa, Texas, some weight to driver’s attempt to hide and failure to acknowledge agent’s presence after agent honked horn and noting "the avoidance of eye contact may or may not be entitled weight”); see also Neufeld-Neufeld, 338 F.3d at 382 (determining reasonable suspicion existed for stop on U.S. Highway 385 in Big Bend National Park in part because the driver "stared straight ahead” and “failed to acknowledge [the agent]”); United States v. Aldaco, 168 F.3d 148, 152 (5th Cir.1999) (“The avoidance of eye contact may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior.”); Nichols, 142 F.3d at 864, 868 (noting that the avoidance of eye contact, by itself, is entitled to "no weight,” but stating the driver Nichols’s overall behavior "obviously adds to the reasonableness of'the Border Patrol agents’ suspicion. Nichols stopped at the intersection for a full twenty to thirty seconds. The Border Patrol vehicle was in plain view less than 15 feet away from Nichols’s vehicle. A street light initially illuminated the Border Patrol vehicle, and the agents illuminated Nichols’s truck with their headlights as Nichols approached the intersection. The Border patrol agents observed that, not only did Nichols avoid making eye contact, but he also did not even look in their direction when they illuminated their headlights, nor did he look in either direction down the road as if to see which way to go. Instead, Nichols simply stared straight ahead into the brush.”). But see United States v. Soto, 649 F.3d 406, 411 (5th Cir.2011) (attaching "little significance to the failure of the driver ... to make eye contact with the agents while they drove beside her vehicle”); Moreno-Chaparro, 180 F.3d at 632 ("We are persuaded that in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight. To conclude otherwise 'would put the officers in a classic heads I win, tails you lose position. The driver, of course, can only lose.' ” (footnote omitted) (some internal quotation marks omitted) (quoting United States v. Escamilla, 560 F.2d 1229, 1233 (5th Cir.1977))); Chavez-Villarreal, 3 F.3d at 126-27 (determining reasonable suspicion did not exist for stop roughly 350 miles from the border on Interstate 40 in situation in which the driver "had a rigid demeanor and looked straight ahead”; after the agent began to follow the driver, the driver "began to change lanes and speeds, slowing down, then speeding up”; and the driver continued to look straight ahead despite the agent pulling up next to him); Oro-na-Sanchez, 648 F.2d at 1040, 1042 (determining reasonable suspicion did not exist for stop approximately fifty miles from the border when, among other things, the vehicle was heavily loaded, and the driver slowed down "considerably,” avoided eye contact with agents, and began driving "somewhat erratically”); Escamilla, 560 F.2d at 1233 (stating that failure to acknowledge the agents’ presence "cannot weigh in the balance in any way whatsoever”).

. See Olivares-Pacheco, 633 F.3d at 405 (stating that six occupants in a truck is “neither illegal nor excessive”).

. See Zapata-Ibarra, 212 F.3d at 883 ("We also consider relevant the number of passengers in the vehicle. [The agent] saw 'several passengers’ in the van, and, although this number is not unusual for a van, it is also consistent with alien smuggling.”); cf. Soto, 649 F.3d at 411 (noting that a car with two passengers was not unusual); United States v. Chavez-Chavez, 205 F.3d 145, 149 (5th Cir.2000) ("Most suspiciously, the five adult passengers visible to the agents appeared dirty and disheveled....”); Morales, 191 F.3d at 604 (noting that "an extraordinary number of passengers” is a factor to consider in deciding whether to make a traffic stop (quoting Brig-noni-Ponce, 422 U.S. at 885, 95 S.Ct. 2574)); cf. Moreno-Chaparro, 180 F.3d at 632-33 (determining reasonable suspicion did not exist for stop in part because "[t]he agent could not point to anything suspicious about the truck. It contained no visible passengers, it had not been modified in an obvious way, and it was not riding low to the ground”).

. See Brignoni-Ponce, 422 U.S. at 885, 95 S.Ct. 2574 (noting, in its list of reasonable-suspicion factors, the Government’s argument that "trained officers can recognize the characteristic appearance of persons who live in Mexico, relying on such factors as the mode of dress and haircut”); Chavez-Chavez, 205 F.3d at 147-50 ("Most suspiciously, the five adult passengers visible to the agents ap *336 peared dirty and disheveled, which has been considered reasonably suspicious in prior cases. As discussed previously, the suspicion raised by the dirty appearance of the passengers is heightened given that the stop occurred at 8:00, decreasing the likelihood that they were returning from a day of outdoor labor.” (citation omitted)); see also United States v. Inocencio, 40 F.3d 716, 720, 723 (5th Cir.1994) ("[A]lthough [the driver] appeared to be dressed as a workman, his clothing appeared too clean to have been working in the field.”); Garcia, 732 F.2d at 1222, 1224 (5th Cir.1984) (“This Court also has relied upon an agent's observation, as was present here, that occupants of the vehicle were unwashed and unkempt,” "a characteristic considered common to individuals who have recently spent time in the brush.” "Moreover, the lateness of the hour substantially reduces the likelihood that those individuals were returning from outdoor work.” (citation omitted)). But see United States v. Jones, 149 F.3d 364, 369 (5th Cir.1998) ("A factual condition which is consistent with the smuggling of illegal aliens in a particular area, will not predicate reasonable suspicion, if that factual condition occurs even more frequently among the law abiding public in the area.”).

. See United States v. Garza, 727 F.3d 436, 441 (5th Cir.2013) ("The area’s reputation as a smuggling route supports [the agent's] reasonable suspicion.”); United States v. Rico-Soto, 690 F.3d 376, 380 (5th Cir.2012) (determining that although the stop occurred approximately 450 miles from the border in Lake Charles, Louisiana, reasonable suspicion existed in part because the stop occurred on I — 10, "a major alien-smuggling corridor”); United States v, Rivera-Gonzalez, 413 Fed.Appx. 736, 739 (5th Cir.2011) (giving weight to "the prevalence of drug and illegal alien smuggling on 1-20 near Midland”); Morales, 191 F.3d at 604 (determining reasonable suspicion existed in part based on the agent’s testimony that "1-20 is 'notorious for alien smuggling and narcotics.’ ”); Orozco, 191 F.3d at 582 ("Although the stop was not within fifty miles of the border, other facts existed indicating that the particular stretch of 1-20 [fifteen miles from Odessa, Texas,] was a favored route for illegal alien smugglers.”). But see Olivares-Pacheco, 633 F.3d at 401, 404 (according minimal to no weight to I-20’s reputation as a smuggling route).

. See Brignoni-Ponce, 422 U.S. at 885, 95 S.Ct. 2574 ("In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling.”); Garza, 727 F.3d at 441-42 (“[A]n officer’s experience is a contributing factor in determining whether reasonable suspicion exists.” (internal quotation marks omitted) (quoting Zapata-Ibarra, 212 F.3d at 882)); Rico-Soto, 690 F.3d at 380 ("[The agent] has worked for the Border Patrol for \9'k years, ten of which were in Lake Charles. He has pulled over vans transporting illegal aliens in that area multiple times. His extensive experience allows him to recognize suspicious circumstances that less-familiar outside observers might never realize were noteworthy.”); Nichols, 142 F.3d at 871 ("The interplay of the agents’ past experience demonstrates the importance of viewing the factors in light of the totality of the circumstances.”).

. See, e.g., Rico-Soto, 690 F.3d at 380 (determining reasonable suspicion existed in part because “the van was traveling westbound through [the agent’s] location in the mid-morning, the main time, route, and direction [the agent’s] past experience has shown smugglers pass by through the area”); Chavez-Chavez, 205 F.3d at 148 (determining reasonable suspicion existed in part because "[t]he agents testified that illegal aliens often travel north on Highway 286 at 8:00 a.m., the approximate time of the stop at issue” and the occupants appeared "dirty and unkept”).

. Cf. Olivares-Pacheco, 633 F.3d at 405 (determining reasonable suspicion did not exist for a stop made on 1-20 near Odessa and labeling the time of the stop (10:30 a.m. on a Monday) "the most innocuous conceivable hour”); United States v. Rangel-Portillo, 586 F.3d 376, 382 (5th Cir.2009) ("What is more indicative of a stop lacking in reasonable suspicion is ... what is missing from the record. In the current case, ... the time of the stop was not suspicious.”).

. Olivares-Pacheco, 633 F.3d at 404.

. See Rico-Soto, 690 F.3d at 381 ("[I]t is not unusual ... for a car to be headed toward the city in which it is registered.... The fact that [the defendant] was driving on Interstate 10 alone would not be too helpful, because it is the most direct route back to Houston, where the van is registered.”); Olivares-Pacheco, 633 F.3d at 404 (determining a vehicle's registration provided “minimal if any suspicion” when vehicle was stopped traveling east on I-20 near Odessa and was registered in the Dallas-Fort Worth area); United States v. Soto, 649 F.3d 406, 408-09, 411 (5th Cir.2011) (determining reasonable suspicion existed to stop the defendant's vehicle on a weekday morning on Interstate 35 between Laredo and San Antonio, Texas, but giving no weight to the vehicle’s registration in city in southeast Texas); United States v. Espinosa-Alvarado, 302 F.3d 304, 306 (5th Cir.2002) (per curiam) (determining reasonable suspicion existed to stop defendant's vehicle less than one mile from the border and according some weight to the fact that the vehicle "was registered in New Mexico, but was over 45 miles from the New Mexico/Texas border on a work-day, driving east on a desolate stretch of Hwy 20 usually trafficked by local residents”); United States v. Lopez, 564 F.2d 710, 713 (5th Cir.1977) ("[W]e view the fact that the car was old, with a large trunk and out-of-county license plates, as having only minor importance. We would have thought it obvious that citizens may leave their state or county without having their purposes questioned.... We are a people on the move, and nary an eyebrow should be raised by seeing a Harris County license plate over 50 miles from our neighbor to the south.”).

. See Rangel-Portillo, 586 F.3d at 382 ("What is more indicative of a stop lacking in reasonable suspicion is ... what is missing from the record. In the current case, ... there is no evidence to indicate that the officer received a tip from an anonymous informant.”).

. 633 F.3d 399 (5th Cir.2011).

. Id. at 409.

. Id. at 401.

. Id.

. Id.

. Id.

. Id. at 401, 405.

. Id.

. Id. at 401, 403.

. Id.

. Id.

. Id. at 409 (“We are satisfied that, if we were to side with the government in this case and affirm the district court’s denial of the defendant’s motion to suppress, we would be doing so on the barest articulation of facts that we have ever credited as constituting reasonable suspicion. This we are unwilling to do.”).

. Id. at 404.

. See, e.g., United States v. Neufeld-Neufeld, 338 F.3d 374, 377, 382 (5th Cir.2003) (according weight to the defendant’s considerable deceleration after seeing the marked patrol car, and the defendant did not appear to be speeding beforehand); United States v. Guerrero-Barajas, 240 F.3d 428, 433 (5th Cir.2001) (according some weigh to fact that the vehicle was “riding low”); United States v. Orozco, 191 F.3d 578, 582 (5th Cir.1999) (according, in case involving a stop on 1-20 near Odessa, Texas, some weight to driver's attempt to hide and failure to acknowledge agent’s presence after agent honked horn and *339 noting "the avoidance of eye contact may or may not be entitled weight”); United States v. Zapata-Ibarra, 212 F.3d 877, 883 (5th Cir.2000) ("We also consider relevant the number of passengers in the vehicle. [The agent] saw 'several passengers’ in the van, and, although this number is not unusual for a van, it is also consistent with alien smuggling.”); United States v. Chavez-Chavez, 205 F.3d 145, 147-50 (5th Cir.2000) ("Most suspiciously, the five adult passengers visible to the agents appeared dirty and disheveled, which has been considered reasonably suspicious in prior cases. As discussed previously, the suspicion raised by the dirty appearance of the passengers is heightened given that the stop occurred at 8:00, decreasing the likelihood that they were returning from a day of outdoor labor.” (citation omitted)).

. See, e.g., United States v. Arvizu, 534 U.S. 266, 273-74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("[Officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.’ ” (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981))); id. ("[A] reviewing court must give due weight' to factual inferences drawn by ... local law enforcement officers.” (citing Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996))); Orozco, 191 F.3d at 581-82.

. United States v. Rodriguez, 564 F.3d 735, 740 (5th Cir.2009).

. United States v. Garza, 727 F.3d 436, 440 (5th Cir.2013).