# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-40329

United States Court of Appeals
Fifth Circuit

**FILED**

January 31, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

ERIKA VERENIZ RODRIGUEZ,

      Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
7:17-CR-913-1

Before SMITH, DENNIS, and HAYNES, Circuit Judges.

PER CURIAM:*

Erika Vereniz Rodriguez appeals from an order denying motions to suppress evidence gathered during a traffic stop. During the stop, Rodriguez, a former felon, was arrested for being a felon in possession of a firearm after a Texas state trooper found multiple firearms in the trunk of her car. After being indicted, Rodriguez filed motions to suppress evidence seized during the stop, arguing that the stop violated her Fourth Amendment rights because there

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-40329

was no reasonable suspicion to support the stop and the trooper extended the stop beyond a reasonable time.  The district court denied the motions, and, after a bench trial, found Rodriguez guilty of being a felon in possession of a firearm.  *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2).  She was sentenced to 87 months' imprisonment and ordered to forfeit her firearms.  Rodriguez appeals the denial of her motions to suppress.  For the following reasons, we AFFIRM.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Factual Background

Rodriguez and a passenger were driving southbound on U.S. Highway 281[1] in Hidalgo County, Texas as their vehicle overtook state trooper Julio Trevino Vivero's patrol car, which was traveling below the speed limit in the right-hand lane.  At the suppression hearing, Vivero testified that Rodriguez followed behind his vehicle for two to three minutes and was "hesitant to pass." Eventually, Vivero reduced his speed, and Rodriguez passed his patrol car.  A sign about 11 miles earlier instructed motorists that the left-hand lane is for passing only.  As depicted in the officer's dashcam video, Rodriguez remained in the left lane after she overtook Vivero, passing a second patrol car that was "on the right side of the highway with [its] emergency lights on, attending to another traffic stop."  She then passed a truck in the right-hand lane that was moving at a slower rate of speed.  Rodriguez remained in the left-hand lane for twelve to fourteen seconds after passing the truck, at which point Vivero began to accelerate to pull her over.

The trooper explained to Rodriguez that he stopped her for driving in the left lane without passing and asked Rodriguez for her license and insurance documentation.  A passenger was also present in the car, who Vivero said was "breathing abnormally," and "just looking straight."  Vivero then separated

---

[1] U.S. Highway 281 is a four-lane highway with two lanes in each direction.

Rodriguez from the passenger by ordering Rodriguez out the car. Vivero testified that he thought "it was a different traffic stop in [his] eyes." Based on his "training [and] experience," he "felt something was going on" that justified separating them and investigating further.

Vivero spoke with the passenger first. He asked her about the parties' itinerary. The passenger hesitated before answering that they were coming from Houston, had stayed overnight in a house, and did not have any luggage.

Vivero next questioned Rodriguez in his patrol car. Rodriguez's answer to at least one question contradicted that of the passenger. Whereas the passenger had told Vivero that she and Rodriguez had met on Facebook, Rodriguez told Vivero that their husbands were in prison together and that she and the passenger became friends after running into each other during visitations. This inconsistency raised Vivero's suspicion, and he continued to investigate. Vivero verified Rodriguez's information on the patrol car's computer and learned that she was a felon. He asked her if she had anything illegal in the vehicle, and Rodriguez eventually told him that the trunk contained firearms. A subsequent search of the vehicle revealed that Rodriguez had approximately nine firearms in her vehicle's trunk.

## B. Procedural History

After being indicted, Rodriguez moved to suppress her statement made during the stop and the firearms found during the search of her vehicle, contending that the initial stop of her car was not supported by reasonable suspicion and that Vivero unconstitutionally extended the stop. During the suppression hearing, the district court opined that the twelve to fourteen seconds that elapsed between when Rodriguez passed the truck and when Vivero initiated the traffic stop "was really quick." Nevertheless, the court stated that the test for reasonable suspicion was whether there was evidence "that [Rodriguez] was in the left[-]hand lane, she had clear traffic, and a few

seconds had passed" before Vivero pulled her over.  The court found that the dashcam video was "conclusive on some evidence . . . to support reasonable suspicion" and stated that the only open question was whether Rodriguez had driven past a sign warning her that the left-hand lane was for passing only.

Rodriguez's counsel argued that there was no evidence that Rodriguez had passed a sign at mile marker 744 alerting drivers to this regulation.  The court rejected that argument, finding that it was "reasonable to believe that [Rodriguez] would have seen th[e] sign heading southbound."  The court reiterated that "there was some evidence that [Vivero] had reasonable suspicion to believe that [Rodriguez] had engaged in a traffic violation for staying in the passing lane longer than she should have" and also found that "the length of the detention was reasonable."  The court denied the motions to suppress, and Rodriguez lodged an objection.  The district court then conducted a bench trial and found Rodriguez guilty of being a felon in possession of a firearm.  Rodriguez timely appealed.

## II. Standard of Review

In examining the district court's denial of Rodriguez's motions to suppress, we review de novo its legal conclusions regarding the constitutionality of the traffic stop and its extension.  *See United States v. Cervantes*, 797 F.3d 326, 328 (5th Cir. 2015).  We review the district court's factual findings, including its credibility determinations, for clear error.  *See United States v. Rangel-Portillo*, 586 F.3d 376, 379 (5th Cir. 2009).  The evidence presented at the suppression hearing is viewed in the light most favorable to the prevailing party, which in this case is the Government.  *See Cervantes*, 797 F.3d at 328.

## III. Discussion

On appeal, Rodriguez challenges the district court's denial of her motions to suppress on the grounds that (1) no reasonable suspicion of criminal activity

No. 18-40329

existed to support the traffic stop and (2) Vivero impermissibly prolonged her detention because he extended the stop without reasonable suspicion of additional criminal activity.

A Fourth Amendment "seizure" occurs when an officer stops a vehicle and detains its occupants. *See United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court set forth a two-pronged analysis under which the constitutionality of a traffic stop is examined. *See United States v. Pack*, 612 F.3d 341, 349–50 (5th Cir. 2010), *modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010). A court must first determine whether the stop was justified at its inception. *Pack*, 612 F.3d at 350. "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). If the stop was justified, the court determines in the second step whether "the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." *Pack*, 612 F.3d at 350. "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Id.*

"[R]easonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, 420 F.3d at 430. "[R]easonable suspicion is a low threshold" and requires only "'some minimal level of objective justification' for making the stop." *United States v. Castillo*, 804 F.3d 361, 367 (5th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The officer must have more than a "mere hunch" that

5

No. 18-40329

the person stopped is engaged in illegal activity, but "reasonable suspicion need not rise to the level of probable cause." *See Lopez-Moreno*, 420 F.3d at 430.

### A. Reasonable Suspicion to Stop Rodriguez

We first evaluate whether Vivero had reasonable suspicion to initiate the stop. The Government argues that Rodriguez was stopped for driving in the left-hand lane without passing in violation of the Texas Transportation Code.[2] Section 544.004 of the Code provides that an operator of a vehicle "shall comply with an applicable traffic-control device [i.e., traffic sign]." TEX. TRANSP. CODE S. § 544.004(a). The Texas Court of Criminal Appeals has held that a violation of § 544.004 occurs when one drives in the left-hand lane without passing another vehicle and there exists a "'left lane for passing only' sign . . . present within a reasonable distance of the traffic stop." *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013). Because "there are no specific guidelines for the spacing of the 'left lane for passing only' signs," courts must determine "whether such a sign is applicable on the facts of each case." *Id.* at 549–50; *see also Castillo*, 804 F.3d at 366 ("[W]e follow *Abney* . . . and conclude that a court

---

[2] In its opposition to the motions to suppress and its briefing to this court, the Government appeared at times to argue that Rodriguez violated § 544.011 of the Texas Transportation Code. However, that provision merely requires that signs on highways directing slower traffic to travel in a lane other than the farthest left lane "must read 'left lane for passing only.'" TEX. TRANSP. CODE ANN. § 544.011. No Texas traffic law specifically addresses driving in the left lane without passing. *See United States v. Castillo*, 28 F. Supp. 3d 673, 674 (S.D. Tex. 2014) (Costa, J.), *aff'd*, 804 F.3d 361 (5th Cir. 2015). Rather, as the Government noted elsewhere in its briefing to the district court and on appeal, the relevant provision is Section 544.004, which requires compliance with traffic signs. *See* TEX. TRANSP. CODE ANN. § 544.004(a).

must 'determine, based on the statute, whether [a] sign is applicable *on the facts of each case*.") (second alteration in original).

Here, as in *Abney*, we must determine whether "the officer had reasonable suspicion that Appellant committed the traffic violation of driving in the left lane without passing when a sign (a traffic control device) prohibited such action." *Abney*, 394 S.W.3d at 548. To determine whether the stop was supported by reasonable suspicion, we consider "the totality of the circumstances" giving rise to the traffic stop, including whether the sign applies to Rodriguez, whether Rodriguez had a credible alternative reason for driving in the left lane, and whether Vivero provided Rodriguez an opportunity to switch lanes before stopping her. *See Castillo*, 804 F.3d at 366–67; *Abney*, 394 S.W.3d at 548–50.

We first consider whether the "left lane for passing only" sign applies to Rodriguez, i.e., whether "the facts support[] a reasonable inference that [Rodriguez] drove past the sign before being pulled over." *Abney*, 394 S.W.3d at 549. In *Abney*, the Texas Court of Criminals Appeals held that an officer did not have reasonable suspicion to pull over Appellant where Appellant, in the officer's opinion, may have passed a "left lane for passing only" sign located at least fifteen miles away, the officer had no idea when Appellant entered the highway, and "[t]he facts support[ed] that Appellant was driving in the left lane to make a left turn." *See* 394 S.W.3d at 549-50. In *Mouton v. State*, a Texas appeals court concluded that there was probable cause to support a traffic stop when the officer observed Mouton driving in the left lane and followed him "for at least a mile before stopping him" three to four miles from the last left-lane-for-passing-only sign. *See* 101 S.W.3d at 690. In *Baker v. State*, the Texas appeals court upheld a traffic stop when the sign was approximately six miles from the location of the stop. *See* 50 S.W.3d at 145. The officer first observed Baker driving in the left-hand lane behind him and

then saw Baker pass him and continue to drive in the left lane for "a quarter to half a mile or three quarters of a mile" before stopping him. *See id.* (internal quotation marks omitted).

Additionally, in *United States v. Castillo*, we determined that a traffic stop was supported by reasonable suspicion when the officer first observed Castillo driving in the left lane 5.3 miles from the closest left-lane-for-passing-only sign. 804 F.3d at 366. The officer caught up with Castillo's vehicle approximately eight miles from the sign and followed the vehicle for an additional three miles before making the stop. *See id.* at 363. In concluding that the stop was valid, we observed that the officer followed Castillo for several minutes and allowed him an opportunity to switch lanes and that Castillo did not provide a "credible alternative reason for driving in the left lane." *Id.*

Here, Vivero testified that there was a sign at mile marker 744 instructing motorists that the left-hand lane was for passing only. Rodriguez came behind Vivero's vehicle and followed it for two to three minutes. Vivero testified that Rodriguez eventually passed him at or around mile marker 751 or 752, and that he pulled her over near mile marker 756. However, Vivero also said he was driving below the speed limit, and the video evidence shows that just over one minute elapsed from when Rodriguez passed Vivero to when she was stopped. Although the dashcam video does not reveal the exact mile at which Rodriguez passed Vivero, if Rodriguez was stopped at mile marker 756—which the parties do not dispute—and Vivero was driving below the speed limit, then Rodriguez could not have passed Vivero around mile marker 751 or 752. Instead, she must have been closer to mile marker 755 when she passed Vivero. Thus, the distance from the left-hand for passing only sign at mile marker 744 to the point at which Vivero first saw Rodriguez driving in

the left lane was about eleven miles.[3]  However, Rodriguez was driving behind Vivero for two to three minutes before she passed him, and Vivero therefore knew Rodriguez was on the highway about eight or nine miles from the "left lane for passing only" sign, increasing the likelihood that she passed it.

These distances are not covered by any of the cases previously discussed—they are longer than the four- to six-mile distances deemed reasonable in *Mouton*, *Castillo*, and *Baker*,[4] and shorter than the fifteen-mile distance that the court in *Abney* held was too far to be applicable.  Besides the distance from the sign, however, we must evaluate other circumstances that inform the likelihood that Rodriguez passed the sign.  *See Abney*, 394 S.W.3d at 549, 550 (conducting a distance-specific analysis in part because the facts did not support "a reasonable inference that the defendant drove past the sign before being pulled over" and stating that how many miles the officer followed the driver and evidence concerning whether there was an entrance on the highway between the sign and location of the stop are "certainly factors to consider when evaluating the totality of the circumstances"); *Castillo*, 804 F.3d at 367 (considering "the typical traffic flow on Highway 59 and the likelihood that a car on that stretch of road would have been traveling a long distance rather than a short one").  Here, the court explained that the stretch of highway that Rodriguez was on was "rural" with occasional ranches and homes "along

---

[3] The caselaw is inconsistent regarding the rubric for measuring whether a sign is applicable because it is within a "reasonable distance": some courts have measured the distance between the sign and the traffic stop, *see* Mouton, 101 S.W.3d at 690; Baker, 50 S.W.3d at 145; Earvin, 2015 WL 4104701, at *5, while others have measured the distance between the sign and where the violation began.  *See* 804 F.3d at 366; 394 S.W.3d at 550.  We follow the approach of Abney, the most thorough Texas case to deal with this issue, and Castillo, a published opinion from this court, and measure the distance between the sign and where the officer first observed the vehicle in the left lane without passing. *See Castillo*, 804 F.3d at 366; *Abney*, 394 S.W.3d at 550.

[4] We note that these cases relied on the distance between the sign and the stop, while *Abney* relied on the distance between the sign and when the driver moved into the left lane.

the side of the highway." While there are turnarounds in the median, the court found that the area of the highway with southbound traffic is generally used for long-distance travel, based on the officer's "being very familiar with this area of the highway." The record does not indicate whether there were on-ramps between the sign and where Vivero first encountered Rodriguez.

In *Abney*, the officer did not know at which point Abney entered the highway and first encountered him on the highway at least fifteen miles from the nearest "left lane for passing only" sign. *Abney*, 394 S.W.3d at 549. Here, Vivero encountered Rodriguez on the highway eight to nine miles from the nearest "left lane for passing only" sign, was familiar with the highway, and knew it was generally used for long-distance travel. Thus, unlike the officer in *Abney*, trooper Vivero could point to articulable facts supporting a reasonable belief that Rodriguez passed the located sign eight to nine miles away. *See Castillo*, 804 F.3d at 367; *Abney*, 394 S.W.3d at 549. Moreover, unlike the driver in *Abney*, who drove in the left lane to make a left turn, *see* 394 S.W.3d at 549, Rodriguez has not explained why she remained in the left lane after clearing the second patrol car on the side of the road and the "obstruction" caused by a slow-moving truck further ahead on the highway and therefore has not advanced "credible alternative reason for driving in the left lane." *Castillo*, 804 F.3d at 366. Her failure to provide a reason for remaining in the left lane for the twelve to fourteen seconds after she passed the slow-moving truck further supports a finding of reasonable suspicion for the traffic stop. *See Castillo*, 804 F.3d at 366; *cf. Jaganathan v. State*, 479 S.W.3d 244, 248 (Tex. Crim. App. 2015) (rejecting the lower court's suggestion that appellant might have thought it was unsafe to switch lanes because it was not obvious from the video that it was unsafe).

At the suppression hearing, defense counsel estimated that Rodriguez traveled about one-tenth of a mile during the twelve to fourteen seconds she

was in the left lane after passing the truck and before Vivero turned on his lights to pull her over. In *Castillo*, the officer observed the driver in the left lane without passing "for several minutes," while the officer in *Baker* observed the driver travel in the left lane "a quarter to half a mile or three quarters of a mile" before pulling him over. *See* 804 F.3d at 366; 50 S.W.3d at 145 (internal quotation marks omitted). Although the officers in those cases observed the drivers in the left lane without passing for greater lengths of time than here, the Government argues that an officer can develop a reasonable suspicion that an individual is driving in the left lane without passing in a brief period of time, citing in support *Jaganathan*, 479 S.W.3d at 247–48, and *Earvin*, 2015 WL 4104701 at \*1. In *Jaganathan*, the Texas Court of Criminal Appeals reversed the appellate court's holding that an officer did not have reasonable suspicion to conduct a traffic stop for driving in the left-hand lane, noting that the officer had driven behind the offender in the left-hand lane for ten to twelve seconds prior to initiating the traffic stop. 479 S.W.3d at 247–48. Similarly, in *Earvin*, the court upheld the denial of a motion to suppress where the officer observed the defendant driving in the left-hand lane for twenty to thirty seconds. 2015 WL 4104701, at \*4–5. Though the court did not specifically address the timing issue in either case, we find them persuasive.

"[R]easonable suspicion is a low threshold, requiring" only "some minimal level of objective justification for making the stop." *Castillo*, 804 F.3d at 367 (internal quotation marks omitted). A traffic stop is justified if the officer has "an objectively reasonable suspicion that . . . a traffic violation, *occurred, or is about to occur*, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430 (emphasis added). The twelve to fourteen seconds that elapsed between Rodriguez's clearance of the truck and Vivero's acceleration to make the traffic stop provided Vivero with reasonable suspicion that a traffic violation had occurred or was about to occur and, certainly, it provided him

with more than a "mere hunch." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). As the *Baker* court explained, "[t]he standards to apply [in enforcing the left-lane-for-passing-only provision] are explicit. If it is in the left lane, the vehicle should be in the process of passing other vehicles. If it is not passing other vehicles, the vehicle should not be in the left lane." *See* 50 S.W.3d at 146.

Based on the totality of the circumstances, and viewing the evidence in the light most favorable to the Government, we conclude that trooper Vivero had reasonable suspicion to stop Rodriguez. *See Castillo*, 804 F.3d at 367; *Cervantes*, 797 F.3d at 328.

### B. Reasonable Suspicion to Extend the Stop

Rodriguez next argues that the district court erred in concluding that the length of the detention was reasonable. She contends that after Vivero twice informed her that he would issue a warning for driving in the left lane, the "need for the stop had ended," and his subsequent questioning of her impermissibly extended the stop beyond a reasonable time.

A traffic stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F.3d at 507; *see Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *Pack*, 612 F.3d at 350.

Here, when Vivero initially asked Rodriguez for her documentation,[5] he noticed that the passenger was "breathing abnormally," and was "looking straight" ahead. Based on his training and experience, Vivero concluded that

---

[5] This preceded Vivero's statements that he would issue a warning.

this "was a different traffic stop" and that "something [was] going on." When Vivero asked the passenger questions at the outset of the stop, she was uncertain and hesitant and initially "couldn't really provide an answer" to the basic question of where she and Rodriguez had stayed overnight in Houston. Although the passenger claimed that the pair did in fact spend the night in Houston, she also confirmed that there was no luggage in the car.

Vivero's questioning of the passenger at the outset of the stop regarding the purpose of her travel and her travel itinerary was permissible and did not unduly prolong the stop. *See United States v. Villafranco-Elizondo*, 897 F.3d 635, 641 (5th Cir. 2018) ("Law enforcement officers have some latitude when speaking to a suspect during a routine traffic stop," and may ask "about the purpose and itinerary of [the suspect's] trip." (internal quotation marks omitted)). Based on his observations that the passenger was nervous, hesitant to answer questions, and provided strange answers, Vivero developed a reasonable suspicion of criminal activity and was entitled to detain Rodriguez and the passenger for a "reasonable time while appropriately attempting to dispel this reasonable suspicion." *Pack*, 612 F.3d at 350; *see id.* at 361 n.5 (holding that reasonable suspicion existed where the officer testified as to the defendant-passenger's nervousness, the driver's and defendant's conflicting stories, and the fact that the pair was traveling on a known drug corridor); *United States v. Fishel*, 467 F.3d 855, 856–57 (5th Cir. 2006) (holding that reasonable suspicion existed based on defendant's nervousness, expired driver's license, and inconsistencies in his story regarding travel plans and ownership of the vehicle); *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003) (holding that articulable facts supporting reasonable suspicion included, *inter alia*, the defendant's nervousness and hesitation in answering questions about travel plans).

In seeking to dispel his reasonable suspicion through further investigation and questioning, Vivero discovered that Rodriguez's answer to the question of how she knew the passenger conflicted with the passenger's answer.  Shortly after asking Rodriguez further questions about her itinerary, Vivero remarked to Rodriguez that "[b]oth yourself and your [passenger] here are extremely nervous" and your passenger "is shaking" and "hesitating."  Thereafter, Vivero stated "[i]t's just not making any sense to me" and asked Rodriguez whether there was anything illegal in the car.  Rodriguez admitted to possessing firearms in the trunk.

Rodriguez asserts that thirteen minutes elapsed between the initiation of the traffic stop and her confession.  Vivero testified that a traffic stop of this nature would normally take five to ten minutes.  Thus, the length of the traffic stop was not unduly long, and Rodriguez even concedes that "the length of time of the questioning was not that great."  Nevertheless, she contends that there was no reasonable suspicion of additional criminal activity once Vivero separated her from the passenger and questioned her in his patrol car.  Specifically, Rodriguez argues that her mere nervousness during the questioning in the patrol car was not sufficient to extend the stop.  Her argument ignores the fact that the passenger's extreme nervousness and inability to clearly answer questions, initially led Vivero to prolong the stop and further question Rodriguez.  Vivero's suspicions grew once he questioned Rodriguez in his patrol car as she gave answers that were inconsistent with the passenger's responses.  Viewing the evidence in the light most favorable to the Government, Rodriguez has failed to establish that Vivero lacked reasonable suspicion to prolong the duration of the traffic stop.  *See Cervantes*, 797 F.3d at 328.  Accordingly, the district court did not err in determining that the length of the stop was reasonable.

No. 18-40329

## IV. Conclusion

For these reasons, we AFFIRM the district court's denial of Rodriguez's motions to suppress.