# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

No. 14-50794

---

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee

v.

JESSE DOMINGUEZ,

　　　　Defendant - Appellant

------------

CONSOLIDATED WITH 14-50823

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee

v.

CRYSTAL DOERR,

　　　　Defendant - Appellant

---

Appeals from the United States District Court
For the Western District of Texas

---

Before STEWART, Chief Judge, and JOLLY and GRAVES, Circuit Judges.

PER CURIAM:

No. 14-50794

The Court having been polled at the request of one of its members, and a majority of the judges who are in regular active service and not disqualified not having voted in favor (Fed. R. App. P. 35 and 5th Cir. R. 35), rehearing en banc is DENIED. In the en banc poll, seven judges voted in favor of rehearing (Judges Jones, Smith, Clement, Owen, Elrod, Higginson, and Costa) and eight judges voted against rehearing (Chief Judge Stewart and Judges Jolly, Davis, Dennis, Prado, Southwick, Haynes, and Graves).

ENTERED FOR THE COURT:

/s/ E. Grady Jolly

_____

E. GRADY JOLLY
United States Circuit Judge

\* \* \* \* \* \* \* \*

JERRY E. SMITH, Circuit Judge, joined by JONES, CLEMENT, and OWEN, Circuit Judges, dissenting from the denial of rehearing en banc:

Rehearing has failed by a tally of 7–8. That is unusually strong support for en banc review of an unpublished opinion in response to which no party moved for rehearing. One might agree with Yogi Berra that "it's *deja vu* all over again." *See Robinson v. Louisiana*, 791 F.3d 614, 615 (5th Cir. 2015) (Smith, J., dissenting from denial of rehearing en banc) (criticizing 7–8 denial on *sua sponte* en banc poll on an unpublished opinion). I respectfully dissent from the refusal to give the full court a chance to reconcile our conflicting jurisprudence on this important aspect of Fourth Amendment law.

2

No. 14-50794

Federal Rule of Appellate Procedure 35(a) states, as one of the two grounds for en banc rehearing, that "en banc consideration is necessary to secure or maintain uniformity of the court's decisions." Despite that a member of the panel, in oral argument, admitted that on the matter of Border Patrol stops, "our opinions go all over the map," the en banc court disregards Rule 35(a). The panel also somehow overlooked the government brief's repeated citation to a recent opinion, reaching the opposite result, with facts materially identical to those here, regarding a Border Patrol stop on the same highway and with a similar pattern of behavior.

The panel decided not to address the facts or the law but, instead, issued an opinion that reads, in its entirety, as follows:

> We have read the record, studied the briefs, and heard very capable arguments from both parties. We have concluded, in the light of our precedents, that reasonable suspicion is not supported by the facts in this case. Too many of the asserted bases for reasonable suspicion can plausibly be explained as normal or innocent conduct; and from which, criminal suspicion under the Fourth Amendment cannot convincingly be inferred. Accordingly, the judgment of the district court is REVERSED and VACATED. The case is REMANDED for entry of a judgment of acquittal.

*United States v. Dominguez*, 611 F. App'x 247, 247 (5th Cir. 2015) (per curiam).

The panel has not disclosed the facts, but I will. The district court made the following comprehensive findings:

> 1. U.S. Customs and Border Protection Agent Juan David Ortiz testified at the Motion to Suppress hearing on February 27, 2014. From 2001–2009 Agent Ortiz served in the United States Navy during which he earned a Bachelor's Degree from American Military University. In 2009, Agent Ortiz joined the U.S. Customs and Border Protection Service. Agent Ortiz received specialized training in the investigation and interdiction of narcotics and human trafficking offenses. During his time with the U.S. Customs and Border Protection, Agent Ortiz earned a Master's Degree from St. Mary's University. Agent Ortiz has spent countless hours observing traffic patterns on Interstate (IH) 35, and

3

No. 14-50794

has experience investigating human and narcotics trafficking. The Court finds the testimony of Agent Ortiz credible.

2. On December 17, 2013, Agent Ortiz was conducting roving patrol in a marked unit on IH 35 around mile marker 112, near Moore, Texas, in the Western District of Texas. Mile marker 112 is roughly 112 miles from the Texas/Mexico border.

3. Agent Ortiz was part of the Highway Interdiction team whose duties are to observe vehicles traveling on IH-35 with the goal of intercepting vehicles engaged in narcotics trafficking, human trafficking, etc. In his duties, Agent Ortiz became familiar with the most common types of traffic on that particular stretch of IH-35, such as oil field trucks, hunting and ranch vehicles, and tourist vehicles.

4. At approximately 10:30am on December 17, 2013, Agent Ortiz noticed a maroon Ford Expedition traveling southbound on IH-35. Agent Ortiz noticed that it was only occupied by passenger Crystal Doerr and driver Jesse Dominguez. The vehicle caught Agent Ortiz's attention because it was different than the majority of traffic on that stretch of highway. It wasn't a working vehicle; it wasn't muddy or dirty from a ranch; and it didn't appear to have any luggage or signs that the two individuals were on a trip. Agent Ortiz did not conduct a traffic stop.

5. Three hours later, at approximately 1:30pm, Agent Ortiz observed the defendants' maroon Ford Expedition travelling northbound on IH-35, with a passenger in the back seat that he did not see when the vehicle was travelling southbound.

6. Agent Ortiz received information from dispatch that the defendants' maroon Ford Expedition never passed through a border checkpoint between the time they traveled southbound and then northbound. There are roads in the area used to circumvent the border check points.

7. Agent Ortiz paralleled the maroon vehicle for 2–3 miles, but driver Dominguez, and passenger Doerr, never looked in his direction at all. Agent Ortiz made his presence clear and obvious, but the passengers remained stiff and faced forward. This was peculiar to Agent Ortiz.

8. Agent Ortiz observed the new, third passenger in the back seat. When Agent Ortiz noticed the small head, he determined it was a small child who was not restrained in a visible child safety seat.

9. Agent Ortiz fell in behind the maroon vehicle and ran the vehicle plates, which came back to passenger Crystal Doerr, San Antonio,

4

No. 14-50794

Texas.   Agent Ortiz observed that Dominguez had  reduced his speed 15 mph, and was traveling 60 mph in a 75 mph zone.   Also, Dominguez was weaving on the shoulder, was unable to maintain a single lane of travel, and was tapping the  brakes.

10. The presence of an unrestrained child in a vehicle travelling erratically on the interstate  further led to the belief that the child did not belong to Dominguez and/or Doerr and that the child  was potentially being trafficked.

11. Agent Ortiz conducted a traffic  stop on IH 35 around mile marker 120.

12. Reasonable suspicion existed to conduct an investigative traffic stop based on the above  facts to further investigate whether Dominguez and Doerr were engaged in the human trafficking  of the child.

13. At the scene of the traffic stop, Agent Ortiz learned that the child was a 4 year old girl from Mexico who was illegally present in the United States.   Dominguez and Doerr were hired to  transport the illegal child from the Cotulla/Dilley area north to San Antonio.   Dominguez and Doerr were to be paid money to traffic the illegal child.   Dominguez and Doerr were both arrested  for violating Title 8, United States Code, Section 1324, Bringing in and Harboring Certain Aliens.

14. At the U.S. Customs and Border Protection station, both Dominguez and Doerr waived  their Miranda rights and confessed that they knew the child was illegally present in the United  States.   They stated they picked up the child in Dilley, Texas from a couple that smuggled her over the Texas/Mexico border.   Dominguez and Doerr travelled northbound on IH 35 with the  child towards San Antonio.   Dominguez and Doerr also stated that they were to be paid money to  transport the child to San Antonio.

In its brief, the government several times cited *United States v. Munoz-Martinez*, 435 F. App'x 333 (5th Cir. 2011) (per curiam), as "a strikingly similar case," and I agree.  It is also "striking" that neither defendant tackled that case in reply.  I will do so now.

The *Munoz-Martinez* panel explained its facts as follows:

On the evening of December 2, 2009, Fernando Munoz–Martinez was driving a pickup-truck south on Interstate 35. Near Artesia Wells, Texas, which is about 56 miles north of the border with Mexico, two

Border Patrol agents observed a pickup-truck exit onto Highway 133. Ten to 15 minutes later, the agents saw what appeared to be the same truck return onto I–35 and head north. After following the vehicle for seven miles, the agents suspected that it was involved in alien smuggling. . . . The agents made an investigatory stop and discovered eight illegal aliens in the truck, including the driver, Munoz–Martinez.

. . .

. . . The agents testified that according to a computer check of the license plate, Munoz–Martinez had not recently passed through the border checkpoint on I–35.

. . . The agents testified that the area where Munoz–Martinez was stopped is notorious for drug-and alien-smuggling activity. Moreover, Munoz–Martinez's purple, low-riding pickup-truck aroused suspicion, as it was atypical of traffic in the area, which primarily included vehicles related to the oil industry, ranching, and hunting. . . . There was testimony that a truck such as this traveling on the state highway in this area after exiting the Interstate was unusual.

Munoz–Martinez's driving behavior was also reasonably suspicious. He initially drove south on I–35, exited into a rural area with no houses, then returned to I–35, northbound. While the agents were driving parallel to Munoz–Martinez's vehicle, they witnessed the head of a previously unseen third passenger "pop up" between the driver and the second passenger, and then return back down. Further, it was suspicious that Munoz–Martinez dramatically slowed his vehicle's speed in half, to about 30 miles-per-hour in a 65 miles-per-hour zone, when he became aware of the agents' presence, though he was never speeding.

Also to be considered is that neither agent had been employed by the Border Patrol for more than a year-and-a-half. One of the agents testified about his experience with smugglers' reactions to law enforcement and stated that he had been involved in smuggling stops after witnessing "bailouts" five or six times. Such testimony indicates that during his brief time as an agent, he had accumulated pertinent experience and that he was relatively knowledgeable.

*Id.* at 334–35.

The factual similarities between *Munoz-Martinez* and *Dominguez* are almost too numerous to list:

No. 14-50794

• Both apprehensions were on Interstate 35 between Laredo and San Antonio, a route notorious for alien- and drug-smuggling.

• Both vehicles were first seen by Border Patrol Agents traveling southbound, then later on the same highway but northbound.

• There was no indication that either vehicle had recently passed through a border checkpoint.

• Both vehicles were first seen (southbound) with only two occupants, both in the front seat, but later (northbound) with a third person visible (here, a four-year-old girl).

• In both instances, there were indications of attempts to hide the newly added passenger.

• Both vehicles were atypical of those that frequented that stretch of road.

• The agents followed both vehicles northbound for several miles, before making the stop, to ascertain whether there was reasonable suspicion.

• Both drivers slowed down noticeably upon seeing the Border Patrol truck.

• Both drivers, after being seen by the agents, exhibited multiple behaviors that the officers, based on experience, saw as suspicious.

• The agents in both cases had substantial experience and knowledge regarding alien-smuggling interdiction.

Despite the remarkable similarities, this court's panel in *Munoz-Martinez* upheld the denial of the motion to suppress and affirmed the conviction, but the panel in the instant case (*Dominguez*), with scant explanation, found a Fourth Amendment violation and directed a judgment of acquittal. The admitted human smuggler in *Munoz-Martinez* remained to serve his sentence, but the confessed child smugglers in *Dominguez* walked. The en banc court, regrettably, declines to address that inconsistency.

Yet, that is the primary function of the en banc court: "to secure or maintain uniformity of the court's decisions." Rule 35(a). What is the hapless Border Patrol agent to do upon seeing a situation similar to that described here?

7

No. 14-50794

Does he or she proceed to apprehend a perceived smuggler and rescue a victim, at the risk of being found to have violated the Constitution? And what about the conscientious district judge, who, upon reading the sparse opinion in *Dominguez*, cannot tell what the panel meant by "the asserted bases for reasonable suspicion [that] can plausibly be explained as normal or innocent conduct [ ] and from which [ ] criminal suspicion under the Fourth Amendment cannot convincingly be inferred"? And what does the panel mean by "our precedents"? Apparently that does not include *Munoz-Martinez*, to which the panel's attention was painstakingly directed.

The responsibility to maintain uniformity rests not only with an individual panel but with the whole court. The panelist in *Dominguez* was accurate to say that this court's reasonable-suspicion decisions are "all over the map," conferring little guidance to those who must enforce the law or judge the resulting cases. Despite that inconsistency, this court, by a vote of 6–9, also recently refused en banc rehearing in *United States v. Gonzalez-Garcia*, 410 F. App'x 827 (5th Cir. 2011) (per curiam), declining to reconcile decisions addressing vehicle stops near Midland/Odessa on Interstate 20—including two opinions issued within days of each other, like ships passing in the night.[1]

Judges decline en banc rehearing for many reasons, most of them salutary. Some judges have a persistent aversion to en banc proceedings. Or a judge may think the panel reached the proper result, so the court should await a case with a more questionable outcome; to the same effect, judges in the panel majority are understandably reluctant to have their opinion vacated and reheard. And it is demonstrably more difficult to obtain en banc consideration

---

[1] *See, e.g.*, *United States v. Cervantes*, 797 F.3d 326 (5th Cir. 2015) (denying suppression, with a dissent); *United States v. Rivera-Gonzalez*, 413 F. App'x 736 (5th Cir. Feb. 22, 2011) (denying suppression); *United States v. Olivares-Pacheco*, 633 F.3d 399 (5th Cir. Feb. 10, 2011) (granting suppression).

where the losing party (here, the government) does not move for full-court review. *See Robinson*, 791 F.3d at 615 (Smith, J., dissenting). Further, because it is not technically binding precedent under Fifth Circuit Rule 47.5, an unpublished decision may not attract as much attention. *See id.* Likewise, where, as here, the panel, for whatever well-intentioned reasons, chooses not to explore the facts or the law, some judges may decide that the case is not worth the en banc candle because the opinion does not explicitly mishandle the relevant issues.

Those excuses, however, do not provide needed answers for the agents in the field, the lawyers who prosecute and defend, or the judges in the courtroom. I respectfully dissent.