# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 17-40739

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellant

v.

JEFFREY LOUIS FREEMAN,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

January 25, 2019

Lyle W. Cayce
Clerk

————————————

Appeal from the United States District Court
for the Southern District of Texas

————————————

Before HIGGINBOTHAM, SMITH, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

This is an interlocutory appeal of the grant of a motion to suppress. Defendant-Appellee Jeffrey Louis Freeman ("Freeman") was stopped twice over the course of several months while driving his truck along Farm-to-Market Road 2050 ("FM 2050") near the Texas-Mexico border, once by a county deputy and once by U.S. Border Patrol Agent Carlos Perez. Freeman was charged with conspiracy to transport an illegal alien within the United States, 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(I), and transportation of an alien within the United States for financial gain, 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II). Freeman filed a motion to suppress evidence obtained from both stops. The magistrate judge held an evidentiary hearing on the motion and recommended

No. 17-40739

the district court grant Freeman's motion as to the first stop but deny his motion as to the second stop. The district court adopted the magistrate judge's recommendation as to the first stop, but not as to the second stop, granting Freeman's motion to suppress as to both stops. The Appellant-Government appeals the district court's ruling as to the second stop only. For the reasons discussed below, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Background of the Area and of Agent Perez

Agent Perez's testimony made up a significant portion of the suppression hearing before the magistrate judge. He testified that he had been a Border Patrol agent at the Freer, Texas immigration checkpoint for over eight years. His duties at the checkpoint consisted of working the inspection lanes and conducting immigration inspections on vehicles that approach the checkpoint. Agent Perez testified that the Freer checkpoint is about 50 miles from the border of the United States and Mexico and approximately 43 miles from Laredo, Texas. It sits on U.S. Highway 59, just north of where FM 2050 dead-ends into Highway 59. If a motorist traveling north on Highway 59 turned right (south) onto FM 2050, he would avoid the Freer checkpoint. Agent Perez testified that turning right onto FM 2050 from Highway 59 will add about an hour onto a trip from Laredo to Houston. It is undisputed that FM 2050 is known for alien and contraband smuggling.

Nevertheless, there are legitimate reasons to be on FM 2050. Agent Perez testified that there are homes, ranches, and businesses along the road. When pressed by the magistrate judge, he guessed there were perhaps a dozen homes, in addition to a wind farm, oil and gas concerns, and other ranches. Agent Perez testified he was familiar with some of the vehicles belonging to homeowners and people who worked on the road, but he was not familiar with all the vehicles. Over the eight years that he worked at the Freer checkpoint,

2

No. 17-40739

Agent Perez had driven on FM 2050 "numerous times," sometimes "on a daily basis."

Agent Perez confirmed that no vehicle is stopped prior to turning down FM 2050, but once a vehicle makes the turn, Border Patrol "attempt to chase down the vehicle and conduct a roving stop" to see if there are any immigration violations occurring. When asked by the Government if the agents were "actually stopping every single vehicle," Agent Perez answered, "Yes, sir."[1] Agent Perez explained these stops generally transpired as follows: an agent on the primary inspection lane, upon seeing a vehicle turn south on FM 2050, alerts an agent inside the checkpoint who comes out and attempts to chase down the vehicle. Once the pursuing agent finds the vehicle matching the description of the vehicle the primary agent called out, he attempts to run a registration check to determine where the vehicle is from, as it is uncommon for vehicles from out of the area to be traveling down FM 2050. While following the vehicle, the agent will observe the vehicle speed, "the driving of the vehicle," and how the driver is reacting to being pursued.

Agent Perez estimated the Border Patrol made approximately ten to twenty roving stops per week on FM 2050. He estimated that he had only conducted approximately twenty to thirty stops throughout his eight years there, and only two or three of those stops resulted in seizures.

---

[1] The exchange between the Government and Agent Perez went like this:
Q. When you say that [you chase down the vehicle to conduct a roving stop], are you – are you stopping every vehicle – let me ask you that.
Are you stopping – actually stopping every single vehicle?
A. Yes, sir.
Q. Okay. And so you're doing this to every single vehicle that turns down that road?
A. That's correct.

No. 17-40739

**B. The February 13, 2017 (Second) Stop**

On February 13, 2017, Agent Perez was working inside the Freer checkpoint rather than on the inspection lanes. Around 4:10 p.m., an agent called out that a white Chevy pickup truck turned onto FM 2050 and Agent Perez and his partner got into the pursuit vehicle and attempted to chase down the truck. Agent Perez estimated it took him and his partner about twenty seconds to walk to their vehicle, and another ten seconds to turn onto FM 2050. Agent Perez thought it took him "[p]erhaps five minutes" to catch up to the truck and that he traveled "about over 100 miles an hour" to reach it, although he had slowed down to "[p]erhaps 70 miles" per hour when he caught up to the truck. While Agent Perez testified that he checked his odometer frequently, he also stated twice that he was not sure if the truck was speeding.

Agent Perez noted the road was windy and hilly, but that it appeared to him the truck was swaying side to side within the lane and creating dust clouds from driving on the soft shoulder of the road. While Agent Perez testified he couldn't remember any construction signs on the road at the time of the stop, the Government stipulated before the hearing began that the road was under construction.

Prior to conducting the stop, Agent Perez testified his partner contacted radio dispatch to run a check on the truck's paper license plate. He initially testified that the paper plate made no difference to him, although after considerable prompting by the magistrate judge, Agent Perez stated that paper license plates are often used by smugglers to avoid suspicion or inspection. What did make a difference to Agent Perez was the fact that the vehicle was registered to an individual (Freeman, it turned out) out of Houston, Texas. Agent Perez noted it is uncommon to see vehicles based out of Houston on FM 2050 because it is not a direct route to Houston. However, nothing else stood

4

out to Agent Perez about the truck; it was the type of vehicle commonly used by oil and gas companies on FM 2050.

While in pursuit of Freeman, Agent Perez could not see into the back of the truck but was able to see Freeman's face in the side view mirror. He thought Freeman appeared to be nervous because he seemed to be glancing into the side mirror several times. Agent Perez activated his emergency lights and conducted a patrol stop. Agent Perez testified the stop occurred approximately nine miles from the checkpoint, but during the hearing defense counsel presented Agent Perez with maps indicating the stop was closer to 7.6 miles from the checkpoint. The stop occurred approximately nine and a half minutes after Freeman's truck was called out. After Agent Perez stopped Freeman, Agent Perez's partner discovered there was a passenger in Freeman's truck, Ms. Miriam Edith Rivera-Quintero. Ms. Rivera-Quintero did not have any legal status to be in the United States.

Ms. Rivera-Quintero testified at the suppression hearing that Freeman appeared to be driving at a normal rate of speed and that he only veered off the road when he was stopped by the agents. She also believed his behavior to be normal and that everything seemed to be fine prior to the car being stopped and the policemen coming up to the truck. However, Ms. Rivera-Quintero testified that she looked at pictures on her phone for much of the trip in an effort to calm herself.

## C. The Magistrate Judge's Report and Recommendation and the District Court's Order

The magistrate judge issued a written report and recommendation, recommending the district court, after an independent review of the record, grant in part Freeman's motion to suppress as it related to the first stop, but deny in part his motion as it related to the February 13, 2017 stop. Freeman filed timely objections, and the district court reviewed the entire record *de*

*novo*. The district court agreed with the recommendation as to the first stop, but disagreed with the recommendation as to the February 13th stop, finding the analysis in Freeman's objections to be persuasive. While the district court noted that Agent Perez admitted to conducting roving patrol stops of all vehicles turning onto FM 2050 from Highway 59, the court said its decision did not hinge solely on that admission and was merely one aspect taken into consideration. At a later hearing regarding the detention of a material witness pending the instant appeal, the district court stated it found Ms. Rivera-Quintero's testimony about Freeman's driving to be truthful. The district court also found that "the math did not add up" with respect to Freeman's speed, and that the agents never actually witnessed Freeman speeding. The district court found there to be "nothing evasive about the way that he was driving," and that the dust being kicked into the air was "as good as it got." The district court characterized the stop as a "fishing expedition" and commented that had the agents been a little more patient and stayed behind the vehicle longer, they could probably have developed reasonable suspicion.

The Government appeals the district court's grant of Freeman's motion to suppress as it relates to the February 13th stop.

## II. STANDARD OF REVIEW

In considering a district court's ruling on a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law, including its determination regarding the presence of reasonable suspicion, *de novo*. *United States v. Cervantes*, 797 F.3d 326, 328 (5th Cir. 2015); *United States v. Lopez-Moreno*, 420 F.3d 420, 429 (5th Cir. 2005) (citing *United States v. Hicks,* 389 F.3d 514, 526 (5th Cir.2004)). We view the evidence in the light most favorable to the party prevailing below—here, Freeman. *Cervantes*, 797 F.3d at 328; *Lopez-Moreno*, 420 F.3d at 429 (citing *United States v. Shelton,* 337 F.3d 529, 532 (5th Cir.2003)). We must defer to the findings of

historical fact made by the district court unless left with the "definite and firm conviction that a mistake has been committed." *Payne v. United States,* 289 F.3d 377, 381 (5th Cir.2002). While this court reviews the district court's legal determination that the historical facts provided reasonable suspicion *de novo,* "due weight" must be given to the "inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States,* 517 U.S. 690, 699 (1996). "The district court's ruling should be upheld if there is any reasonable view of the evidence to support it." *United States v. Ortiz,* 781 F.3d 221, 226 (5th Cir. 2015) (quoting *United States v. Scroggins,* 559 F.3d 433, 440 (5th Cir. 2010)) (internal quotation marks omitted).

## III. DISCUSSION

### A. Reasonable Suspicion for Roving Patrol Stops

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend" to roving patrol stops by U.S. Border Patrol agents. *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio,* 392 U.S. 1, 9 (1968); *United States v. Cortez,* 449 U.S. 411, 417 (1981)). "To temporarily detain a vehicle for investigatory purposes, a Border Patrol agent on roving patrol must be aware of 'specific articulable facts' together with rational inferences from those facts, that warrant a reasonable suspicion that the vehicle is involved in illegal activities, such as transporting undocumented immigrants." *United States v. Rangel-Portillo,* 586 F.3d 376, 379 (5th Cir. 2009) (quoting *United States v. Chavez-Chavez,* 205 F.3d 145, 147 (5th Cir. 2000)).

In *United States v. Brignoni-Ponce,* 422 U.S. 873, 884–85 (1975), the Supreme Court outlined several factors to be considered when determining if reasonable suspicion exists. The *Brignoni-Ponce* factors include:

> (1) the area's proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents' experience in

detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior.

*Cervantes*, 797 F.3d at 329 (quoting *United States v. Soto*, 649 F.3d 406, 409 (5th Cir. 2011)). "No single factor is determinative; the totality of the particular circumstances known to the agents are examined when evaluating the reasonableness of a roving border patrol stop." *United States v. Hernandez*, 477 F.3d 210, 213 (5th Cir. 2007). The primary elements "of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas*, 517 U.S. at 696–97.

## B. Application of the *Brignoni-Ponce* Factors to the District Court's Findings of Fact

While the magistrate judge concluded the facts supported reasonable suspicion, in making a *de novo* determination of the factual findings and legal conclusions, the district came to the opposite conclusion. The district court did not explicitly make any factual findings in its order, but stated it found persuasive Freeman's objections to the magistrate judge's report, which largely contested the report's conclusions rather than its factual findings. The district court further explained its reasoning at a later hearing. The Government argues the district court clearly erred by not applying the totality of the circumstances test, noting that Freeman's objections went through the *Brignoni-Ponce* factors in isolation rather than as a laminated whole. The Government also complains that the district court inappropriately considered the fact that the agents were stopping every car that turned right onto FM

8

2050. Freeman maintains the district court correctly examined the *Brignoni-Ponce* factors in totality and properly weighed the factors.

### 1. Proximity to the Border

"[O]ne of the vital elements in the *Brignoni-Ponce* reasonable suspicion test is whether the agents had reason to believe that the vehicle in question recently crossed the border." *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir. 1984). "[A] car traveling more than 50 miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there." *United States v. Jacquinot*, 258 F.3d 423, 428 (5th Cir. 2001) (per curiam) (citing *United States v. Zapata-Ibarra*, 212 F.3d 877, 881 (5th Cir. 2000)). "If there is no reason to believe that the vehicle came from the border, the remaining factors must be examined charily." *United States v. Olivares-Pacheco*, 633 F.3d 399, 402 (5th Cir. 2011). While this court does not adhere to a bright line test regarding proximity, the proximity element can be satisfied "if the defendant's car was first observed within 50 miles of the United States/Mexico border, but was stopped more than 50 miles from the border." *Jacquinot*, 258 F.3d at 428.

The facts here are essentially undisputed—Freeman's truck was spotted less than 50 miles from the border and was stopped more than 50 miles from the border. Because the truck was spotted less than 50 miles from the border, the proximity element is satisfied. Nevertheless, this fact alone cannot support reasonable suspicion, "otherwise, law enforcement agents would be free to stop any vehicle on virtually any road anywhere near the Texas-Mexico border." *Rangel-Portillo*, 586 F.3d at 380 (quoting *United States v. Diaz,* 977 F.2d 163, 165 (5th Cir. 1992)). We must determine *de novo* how much weight to give this factor.

Freeman argues that because his truck was seen and stopped so close to the 50-mile benchmark, Agent Perez should have had additional independent

indicia that Freeman had recently crossed the border and therefore this factor should receive little weight. While there are not many towns between Laredo and Freer along Highway 59, we hesitate to conclude that driving on a road coming from a densely populated city such as Laredo, even if situated along the border, can weigh *heavily* in favor of reasonable suspicion. *See Melendez-Gonzalez*, 727 F.2d at 411 ("If a vehicle is already past towns in this country, the mere fact that it is proceeding on a public highway leading from the border is not sufficient cause to believe the vehicle came from the border."); *see also Rangel-Portillo*, 586 F.3d at 380–81 (stop within 500 yards of border was not supported by reasonable suspicion even where stop was conducted in area known for illegal alien smuggling). Accordingly, while we conclude that the stop occurred within proximity to the border, proximity here carries its weight only where there are other factors present which suggest illegal activity. As we shall explore below, that is not the case here.

2. <u>Usual Traffic Patterns, Recent Illegal Activity, and Passengers</u>

Agent Perez testified that the traffic patterns on February 13, 2017 were not unusual for the area. It is also undisputed that there was no recent information about illegal trafficking in the area prior to the agents pursuing Freeman. Further, Agent Perez and his partner did not see any passengers in the truck prior to stopping Freeman. Consequently, none of these factors weigh in favor of reasonable suspicion.

3. <u>Freeman's Behavior</u>

i. *Speeding*

The district court found that Agent Perez's "math did not add up" and that he never saw Freeman speeding. This is a factual finding accorded deference, especially where Agent Perez specifically testified he was unsure whether Freeman was speeding. Further, while Agent Perez noticed that Freeman's truck kicked up dust clouds, Freeman's objections noted that, at

least as of October 2016, FM 2050 was under construction and the new pavement had not been completed. Further, Freeman's truck had kicked up dust prior to his first stop, where it was shown he was traveling under 60 miles per hour, and the Government at the suppression hearing stipulated that the road was under construction at the time of both stops. Taking these facts in the light most favorable to Freeman, we find no error in the district court's factual determination that Freeman was not speeding and it was therefore objectively unreasonable for Agent Perez to have concluded he was.

### ii. *Looking Nervous and Erratic Driving*

The district court credited Ms. Rivera-Quintero's testimony that Freeman did not seem nervous and did not appear to be swerving,[2] and could have reasonably inferred that even if Freeman was glancing in his side mirror, this was a response to being pursued by Agent Perez, especially where Agent Perez testified that part of the purpose of pursuing vehicles that turn right onto FM 2050 is to see how the driver reacts to such pursuit. *United States v. Jones*, 149 F.3d 364, 370 (5th Cir. 1998) ("[W]hen the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed."). It is therefore not clearly erroneous for the district court to have found Freeman was not driving erratically.

---

[2] The Government filed a Rule 28j letter prior to oral argument where it argued for the first time that the district court improperly disregarded the credibility determinations made by the magistrate judge without holding its own hearing. Whether or not this issue was waived, the district court was well within its right to rely on Agent Perez's testimony that he was unsure Freeman was speeding, especially in light of the totality of the record, including Ms. Rivera-Quintero's testimony, the condition of FM 2050, and the time between the call-out and the stop.

No. 17-40739

### 4. Characteristics of the Area

The characteristics of the area weigh in favor of reasonable suspicion. It is essentially undisputed that FM 2050 is a known smuggling route, which weighs in favor of reasonable suspicion.[3] *Zapata–Ibarra,* 212 F.3d at 881–82 (quoting *United States v. Aldaco,* 168 F.3d 148, 151–52 (5th Cir. 1999) ("It is well established that a road's reputation as a smuggling route *adds* to the reasonableness of the agents' suspicion."); *but see Rangel-Portillo*, 586 F.3d at 380 (5th Cir. 2009) ("Absent some other contributing factor, merely driving in an area 'notorious for alien smuggling,' alone, does not constitute reasonable suspicion.").

### 5. Particular Aspects of the Vehicle

As for the particular aspects of the vehicle, the truck was of the type normally found on FM 2050. Nevertheless, the truck had paper license plates and was registered to an individual out of Houston. Based on Agent Perez's testimony, at the time of the stop Agent Perez did not find the temporary plates to be suspicious. However, after being pressed by the magistrate judge he stated paper plates could indicate someone attempting to avoid detection. What Agent Perez did find unusual was the fact that the vehicle was registered to an individual rather than a company, as well as the fact that the truck was from Houston and FM 2050 was not the most direct route to Houston. Freeman argues the district court properly accorded little to no weight to these factors.

---

[3] At the end of its opening brief, the Government argues *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) applies. *Martinez-Fuerte* concerned permanent checkpoints and held that "stops and questioning . . . may be made in the absence of any individualized suspicion at reasonably located checkpoints." 428 U.S. at 562. The Government claims it is "undisputed" that the Freer checkpoint is reasonably located; however, the Government did not raise this issue in the district court and the reasonableness of the checkpoint's location is subject to judicial review. *Id.* at 559. This issue is therefore not properly before us, as neither the district court nor Freeman had an opportunity to consider or develop facts or argument on this issue. *See Benefit Recovery, Inc. v. Donelon,* 521 F.3d 326, 329 (5th Cir. 2008) ("We will not consider arguments or evidence that was not presented to the district court.").

No. 17-40739

While the weight given these factors is reviewed *de novo*, the facts must be viewed in the light most favorable to Freeman.

Freeman argues that the reasoning behind paper plates contributing to reasonable suspicion—that a driver might wish to evade detection—does not apply in this case because when Agent Perez's partner ran the license plate, it turned up current information. The Government counters that Freeman is simply considering this fact in isolation and not how an objective officer would view the situation. However, Freeman's interpretation appears bolstered by the fact that, at the time of the stop, Agent Perez did not find the paper license plates to be anything unusual. The facts must be taken together (both the paper plates *and* the current registration) and viewed in the light most favorable to Freeman—meaning paper license plates under these specific circumstances deserve little weight.

Freeman next notes that the assumption that it is suspicious to travel an indirect route to where the car is registered "cannot be made. Even if such an assumption were 'reasonable,' it simply is not unusual that the particular route chosen by a driver does not coincide with a route Border Patrol Agents consider more direct or common. This is especially true when the driver is from another part of the state." *United States v. Escamilla*, 560 F.2d 1229, 1232 (5th Cir. 1977). To the extent that Freeman's decision to take an indirect route to Houston affects the reasonable suspicion analysis, it is encompassed within the fact that FM 2050 is a known smuggling route.

The Government mentions several times the fact that Agent Perez did not recognize Freeman's truck and argues this weighs in favor of reasonable suspicion. However, the Government significantly overstates how familiar Agent Perez was with the local traffic, as Agent Perez only said he recognized some vehicles, not that he recognized most. Further, Agent Perez did not actually testify that he did not recognize the truck, as it was a common type of

vehicle to be in that area and he found nothing suspicious about it until after running the license plate check.

6. Agent Perez's Experience

The remaining factor is Agent Perez's experience, which, after proximity to the border, is likely the most important factor because the facts are to be viewed through the eyes of an objective officer with Agent Perez's experience. *See Arvizu*, 534 U.S. at 273 ("This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (internal quotation marks omitted)); *United States v. Neufeld-Neufeld*, 338 F.3d 374, 380 (5th Cir. 2003) ("[W]e must view all the facts as a collective whole in light of the context and the Agent['s] experience.").

The parties diverge in how they characterize Agent Perez's experience. Freeman contends that the district court correctly concluded that Agent Perez was inexperienced at detecting illegal activity. The Government contends that with over 8 years of experience at the checkpoint and twenty to thirty stops on this specific road, Agent Perez should be considered to have extensive experience. However, it is not simply the agent's time on the job that is relevant, but the agent's experience in *detecting illegal activity*. *Cervantes*, 797 F.3d at 329.

Viewed in the light most favorable to Freeman, Agent Perez's experience as it pertained to detecting illegal activity on roving patrol stops should be viewed in a much more constrained way. It is undisputed Agent Perez drove FM 2050 "numerous times," but that he made only two to three successful stops over the course of eight years. When these facts are considered in context with the normal number of stops on FM 2050, it suggests Agent Perez had very little experience detecting illegal activity. Agent Perez testified that agents conducted approximately ten to twenty stops per week. Taking the low range

of this estimate, that would mean approximately 4,160 stops were conducted during his tenure at the Freer checkpoint. Even assuming Agent Perez made thirty stops, he participated in only a fraction of the stops along FM 2050, and, out of the few stops he made, he was successful only about 10% of the time. Seen in this light, the district court could reasonably have discounted Agent Perez's experience as it related to forming reasonable suspicion. Likewise, we conclude this factor bears little weight in the analysis.

   7. Examining the Factors as a "Laminated Total"

   At this point, we are left with the following facts to be viewed from Agent Perez's limited experience in detecting illegal activity: Freeman's truck, a type commonly found in the area, was seen less than 50 miles from the border, it turned right onto a road known for smuggling, and his truck was registered to an individual. We conclude that these facts, without more, are not enough to support reasonable suspicion, especially when viewed through the eyes of an agent with minimal experience detecting illegal activity. Courts that have found reasonable suspicion, even in cases in close proximity to the border, have generally required more.[4] This case is more closely analogous to *Rangel-*

---

[4] *See e.g.*, *United States v. De Leon-Reyna*, 930 F.2d 396 (5th Cir. 1991) (en banc) (agent saw welding truck with no welding equipment on known smuggling route; truck had stack of plywood indicating plywood had all been loaded at one time, but no indications of how cargo could have been loaded; driver appeared "scared"; truck had broken shock absorber suggesting heavy load in rear of truck; license plates were registered to a dump truck); *United States v. Canales*, 62 F.3d 395, 1995 WL 450255 (5th Cir. 1995) (unpublished) (agents were notified by ranch employee that unauthorized vehicle was using private ranch road; private road was often used by smugglers; truck matched description of unauthorized vehicle; truck's license plates were not registered); *United States v. Delgado*, 99 F. App'x 493 (5th Cir. 2004) (unpublished) (Border Patrol sensors were set off on private ranch road at unusual hour of the morning; private road was generally only used by ranchers; truck was registered from out of town; reason to believe defendant's truck had come from private ranch road; truck had no visible load but bed of truck appeared lower than expected for unloaded truck; truck was preceded by possible scout vehicle); *United States v. Rodriguez*, 585 F. App'x 307, 308 (5th Cir. 2014) (unpublished) (rented vehicle not of the type usually seen on FM 2050; car traveling in tandem with another vehicle; neither vehicle was registered locally; there had been recent alien smuggling activity in area).

*Portillo*, where the court found no reasonable suspicion. *Rangel-Portillo*, 586 F.3d at 380–81. There, 500 yards from the border in an area known for smuggling, the driver of a Ford Explorer pulled out of a Wal-Mart parking lot, made eye contact with the Border Patrol agent, and his passengers looked straight forward and did not make eye contact with the agent. *Id.* If the facts of this case constituted reasonable suspicion, virtually anyone who drove a car registered to an individual and turned right onto FM 2050, a public road, would be subject to being stopped by Border Patrol agents. As the district court pointed out, had Agent Perez waited a little longer, he may have been able to develop reasonable suspicion; he did not. "The district court's ruling should be upheld 'if there is any reasonable view of the evidence to support it,'" *Ortiz*, 781 F.3d at 226 (quoting *Scroggins*, 190 F.3d at 671). There are ample grounds to support the district court's determination that reasonable suspicion was lacking.

## C. The Significance of *Whren*

The Government argues the district court committed legal error by ignoring the Supreme Court's pronouncement in *Whren v. United States*, 517 U.S. 806, 813 (1996) and considering and crediting Agent Perez's testimony that Border Patrol agents stopped all cars turning right onto FM 2050. In *Whren*, the Supreme Court noted "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren*, 517 U.S. at 813 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). However, the amount of significance the district court attributed to the Border Patrol's practice is largely irrelevant where the factors, when viewed together, do not support reasonable suspicion.

16

No. 17-40739

## IV. CONCLUSION

Because the district court's conclusion that the officer lacked reasonable suspicion to conduct the roving patrol stop was supported by the evidence, we AFFIRM the district court's grant of Freeman's motion to suppress.

No. 17-40739

JERRY E. SMITH, Circuit Judge, dissenting:

There is no Fourth Amendment violation. Nevertheless, the majority—guided by the erroneous decision of the district court—misapplies Supreme Court and Fifth Circuit precedent in determining that the exclusionary rule applies. The majority's well-intended blunder means that a clear violation of the immigration laws—transportation of an illegal alien—may go unpunished.[1] I respectfully dissent and would reverse the order granting the motion to suppress.

The district court incorrectly weighed the *Brignoni–Ponce* factors[2] by adopting the analysis provided by Freeman in his objection to the magistrate judge's report and recommendation. That analysis failed to examine correctly the factors based on the totality of the circumstances. Moreover, the court improperly considered Agent Perez's subjective intent when making its determination, in violation of the admonishment in *United States v. Whren*, 517 U.S. 806, 813 (1996), that Supreme Court precedent "foreclose[s] any argument that the constitutional reasonableness of [a] traffic stop[] depends on the actual motivations of the individual officers involved." Consequently, because the district court operated under an errant view of the law, the majority should have "examine[d] th[e] entire matter *de novo.*" *United States v. Toussaint*, 838 F.3d 503, 507 (5th Cir. 2016).

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."[3]   "[T]he 'balance

---

[1] Following its decision on the motion to suppress, the district court stated, "I'm satisfied that if this case—well, if my decision gets affirmed, then the Government's not going to have any evidence against you . . . ."

[2] *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).

[3] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting U.S. CONST. amend. IV);

between the public interest and the individual's right to personal security,' tilts in favor of a standard less than probable cause in such cases . . . ." *Arvizu*, 534 U.S. at 273 (quoting *Brignoni–Ponce*, 422 U.S. at 878). Consequently, no Fourth Amendment violation occurs where "the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Id.* (quoting *Terry*, 392 U.S. at 30).

Although the "concept of reasonable suspicion is somewhat abstract," *id.* at 274, reviewing courts making reasonable-suspicion determinations "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). This requires that a reviewing court "allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 449 U.S. at 418). "[T]he likelihood of criminal activity" required for reasonable suspicion "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274. Further, the reasonableness of a traffic stop does not hinge on the subjective motivations of the officers, *Whren*, 517 U.S. at 813, so long as "the circumstances, viewed objectively, justify that action." *Id.* (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)).

In *Brignoni–Ponce*, the Court articulated a multifactor test for deciding whether an officer has the reasonable suspicion to warrant stopping a vehicle near the border.[4] We have summarized the factors as follows:

---

*see also Terry v. Ohio*, 392 U.S. 1, 9 (1968).

[4] *See Brignoni–Ponce*, 422 U.S. at 884–85; *see also United States v. Rangel–Portillo*,

No. 17-40739

(1) the area's proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) the agents' experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking of aliens or narcotics in the area; and (8) the number of passengers and their appearance and behavior.

*United States v. Cervantes*, 797 F.3d 326, 329 (5th Cir. 2015) (quoting *United States v. Soto*, 649 F.3d 406, 409 (5th Cir. 2011)).

"No single factor is determinative; the totality of the particular circumstances must govern the reasonableness of any stop by roving border patrol officers."[5]  The totality of the circumstances standard specifically precludes a "divide-and-conquer analysis," *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (quoting *Arvizu*, 534 U.S. at 274), or an "excessively technical dissection," *id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 234 (1983)).  Instead, it "requires courts to consider 'the whole picture.'" *Id.* (quoting *Cortez*, 449 U.S. at 417).  "A factor viewed in isolation is often more 'readily susceptible to an innocent explanation' than one viewed as part of a totality." *Id.* at 589 (quoting *Arvizu*, 534 U.S. at 274).

---

586 F.3d 376, 379 (5th Cir. 2009) ("To temporarily detain a vehicle for investigatory purposes, a Border Patrol agent on roving patrol must be aware of 'specific articulable facts' together with rational inferences from those facts, that warrant a reasonable suspicion that the vehicle is involved in illegal activities, such as transporting undocumented immigrants." (quoting *United States v. Chavez-Chavez*, 205 F.3d 145, 147 (5th Cir. 2000))).

[5] *Soto*, 649 F.3d at 409 (quoting *United States v. Moreno–Chaparro*, 180 F.3d 629, 631–32 (5th Cir. 1998); *see also United States v. Sokolow*, 490 U.S. 1, 9 (1989) (finding that each individual factor alone was "quite consistent with innocent travel," but when "taken together [the circumstances] amount to reasonable suspicion that criminal activity was afoot"); *Cervantes*, 797 F.3d at 329 ("[This court] look[s] to the totality of the circumstances, and not every factor must weigh in favor of reasonable suspicion for it to be present. 'Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers.'" (quoting *United States v. Olivares–Pacheco*, 633 F.3d 399, 402 (5th Cir. 2011))); *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir. 2009) ("No single factor is dispositive, and each case must be examined based on the totality of the circumstances known to the agents at the time of the stop and their experience in evaluating such circumstances.").

No. 17-40739

## I.

## A.

Based on the facts in the record and the evidence from the suppression hearing, the magistrate judge determined that Perez had reasonable suspicion to believe that illegal activity was occurring when he stopped Freeman. Those findings with respect to the *Brignoni–Ponce* factors, as well as our related precedents, are summarized below:

- (1) *The area's proximity to the border.* "This Court has repeatedly stated that '[t]he first factor, proximity to the border, is a "paramount factor" in determining reasonable suspicion.'" *Cervantes*, 797 F.3d at 340 (quoting *United States v. Orozco*, 191 F.3d 578, 581 (5th Cir. 1999)). Additionally, "a vital element of the *Brignoni–Ponce* test is whether the agent had 'reason to believe that the vehicle [in question] had come from the border.'" *United States v. Garcia*, 732 F.2d 1221, 1223 (5th Cir. 1984) (quoting *United States v. Lamas*, 608 F.2d 547, 549 (5th Cir. 1979)). We have also held that "[t]he proximity element is satisfied . . . if the defendant's car was first observed within 50 miles of the United States/Mexico border, but was stopped more than 50 miles from the border." *United States v. Jacquinot*, 258 F.3d 423, 428 (5th Cir. 2001). In this case, the magistrate judge correctly found that "it is undisputed that [Freeman's] vehicle was observed traveling on U.S. Highway 59 and detouring before the checkpoint, which is within the fifty mile benchmark." This factor weighs in favor of reasonable suspicion.

- (2) *Characteristics of the area.* We have repeatedly recognized that FM 2050 is a popular route for smugglers of illegal aliens and narcotics because it allows smugglers to avoid the Border Patrol checkpoint on Highway 59.[6] Moreover, "[i]t is well established that a road's reputation as a smuggling route *adds* to the reasonableness of the agents' suspicion." *Jacquinot*, 258 F.3d at 429

---

[6] *See, e.g., United States v. Rodriguez*, 585 F. App'x 307, 308 (5th Cir. 2014) (per curiam); *United States v. Delgado*, 99 F. App'x 493, 495 (5th Cir. 2004) (per curiam); *United States v. Canales*, No. 94-60739, 1995 WL 450255, at *3 (5th Cir. July 7, 1995); *United States v. De Leon-Reyna*, 930 F.2d 396, 397 (5th Cir. 1991) (en banc) (stating that FM 2050 is "a known alternative route of drug and alien smugglers seeking to avoid nearby Border Patrol checkpoints"). *Canales* is binding precedent. *See* 5TH CIR. RULE 47.5.3 ("Unpublished opinions issued before January 1, 1996, are precedent.").

(quoting *United States v. Zapata–Ibarra*, 212 F.3d 877, 881–82 (5th Cir. 2000)).  FM 2050 is sparsely populated, with "perhaps a dozen" residences, some oil-and-gas interests, and a wind farm.  No retail businesses are found on FM 2050, a thirty-plus mile stretch of road.  This factor weighs in favor of reasonable suspicion.

- (3) *Usual traffic patterns.*  We have previously determined that "FM 2050 is not well-traveled."  *De Leon-Reyna*, 930 F.2d at 397 n.1.  As the magistrate judge noted, the road "traverses a sparsely populated area and is not a direct route for vehicles traveling from Laredo to Houston on U.S. Highway 59, or to the nearby town of Hebbronville on State Highway 359."  Furthermore, as Perez indicated, Freeman's vehicle was registered in Houston.  Consequently, Freeman's deviation from the most direct route from Laredo to Houston (northwest on Highway 59) by turning right on FM 2050 (which heads due south *away* from Houston and adds almost an hour to the trip), rightly raised Perez's suspicion.  *See Zapata–Ibarra*, 212 F.3d at 883–84.  This factor weighs in favor of reasonable suspicion.

- (4) *The agents' experience in detecting illegal activity.*  At the time Freeman's vehicle was stopped, Perez had spent over eight years as a United States Border Patrol Agent at the Freer checkpoint on Highway 59.  He is a graduate of the border patrol academy, a three-month program, and is entrusted with the enforcement of immigration laws, which is his "main job title."  Perez patrolled FM 2050, at times, on a daily basis.  "[A]n officer's experience is a contributing factor in determining whether reasonable suspicion exists."  *United States v. Garza*, 727 F.3d 436, 441 (5th Cir. 2013) (quoting *Zapata–Ibarra*, 212 F.3d at 883–84).  That Perez had conducted only twenty to thirty roving stops during his eight years as a Border Patrol agent does not, as the majority asserts, suggest that "Agent Perez had very little experience detecting illegal activity."[7]  Moreover, we have spoken clearly on this issue: "[T]he totality of the circumstances should reflect the outcome of a process in which 'officers [] draw on their own experience and specialized training to make inferences from and deductions about the

---

[7] As the government correctly notes, this court has often credited, in the context of a *Brignoni–Ponce* analysis, the experience of agents with less seniority than Perez's.  *See, e.g.*, *United States v. Ramirez*, 839 F.3d 437, 439 (5th Cir. 2016) (crediting, as part of our reasonable experience analysis, the experience of an agent who had been on the job for six years); *Garza*, 727 F.3d at 441 (three years); *Jacquinot*, 258 F.3d at 429 (three years).

cumulative information available to them that might well elude an untrained person.'" *United States v. Neufeld-Neufeld*, 338 F.3d 374, 379 (5th Cir. 2003) (quoting *Arvizu*, 534 U.S. at 273). This factor weighs in favor of reasonable suspicion.

- (5) *Behavior of the driver.* Perez testified that when he first observed Freeman's vehicle "it appeared to be swaying side to side within the lane, getting off to the soft shoulder and creating dust clouds," and at one point drove off the road by taking the inside corner of a turn. He stated that Freeman repeatedly checked his side view mirrors and "[a]ppeared to be nervous." Perez also testified that he traveled at speeds in excess of 100 miles per hour, frequently checking his speedometer, for several minutes to catch up with Freeman. From this, he inferred that Freeman was speeding. Miriam Rivera-Quintero, a passenger in Freeman's truck, testified that she did not think Freeman was driving erratically but acknowledged that she was focused on looking at pictures on her cell phone to calm herself down.[8] She did not see the speedometer. Even when viewing the facts in a light most favorable to Freeman, including accepting that Freeman may not have been speeding, this factor weighs in favor of reasonable suspicion.

- (6) *Particular aspects or characteristics of the vehicle.* A vehicle's characteristics may help establish reasonable suspicion. *See Jacquinot*, 258 F.3d at 430; *De Leon-Reyna*, 930 F.2d at 397–98. The border patrol agents ran a check on Freeman's license plate and determined that the vehicle (a truck) was registered to an individual in Houston. Although Freeman's white truck was similar in appearance to those vehicles used by employees of oil-and-gas companies operating in the area, those vehicles are generally registered to the companies and not to individuals. Perez did not recognize Freeman's vehicle. Moreover, the truck had temporary paper plates as distinguished from permanent "tin" plates. Perez testified that temporary plates are a common device used by illegal alien and narcotics traffickers "to avoid an inspection or suspicion" because the database for temporary plates is sometimes "not updated properly." This factor weighs in favor of reasonable

---

[8] The majority claims that the magistrate judge "pressed" Perez while he was on the stand, perhaps to cast doubt on the validity of his testimony. The majority glosses over the fact that the magistrate judge reprimanded Freeman's attorney for asking leading questions during the direct examination of Rivera-Quintero. The magistrate judge stated, "Mr. Guerra, your questions are leading and she's a witness."

suspicion.

- (7) *Information about recent illegal trafficking of aliens or narcotics in the area.* There is no evidence in the record concerning whether the agents had information concerning recent illegal activity in the area. Therefore, this factor does not weigh in favor of reasonable suspicion. But we have also held that "[n]ot every *Brignoni–Ponce* factor need weigh in favor of reasonable suspicion for it to be present, nor does the Fourth Amendment require law enforcement to eliminate all reasonable possibility of innocent travel before conducting an investigatory stop." *Zapata–Ibarra*, 212 F.3d at 884.

- (8) *The number of passengers and their appearance and behavior.* Because Perez was unable to observe the number of passengers, their appearance, or behavior, this factor does not weigh in favor of reasonable suspicion. In any event, however, the absence of this factor does not, under this court's precedent, weigh against a finding of reasonable suspicion. *Id.*

## B.

*Brignoni–Ponce* requires that we weigh this evidence in light of "the 'laminated' totality of the facts and circumstances." *Id.* "The 'totality of the circumstances' requires courts to consider 'the whole picture.'" *Wesby*, 138 S. Ct. at 588 (quoting *Cortez*, 449 U.S. at 417). Supreme Court precedent in this area "recognize[s] that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.*; *see also Arvizu*, 534 U.S. at 277–78.

Although the district court did not conduct a hearing and made no explicit factual findings in its suppression order, it declined to adopt the magistrate judge's report and recommendation, instead noting that it "agree[d] with the Defendant's examination of the *Brignoni–Ponce* factors under the particular facts of this case." The district court's *de novo* review of this factually-intensive issue was stated, in its entirety, in a single paragraph:

No. 17-40739

After reviewing the entire record—including the [m]otion to [s]upress, the suppression hearing, the [report and recommenddation], the objection, and all the relevant authorities . . . the Court . . . disagrees with the recommendation regarding the February 13th stop. Although the Court believes that the agents had good intentions and realizes that they oftentimes face difficult challenges in performing their duties, Agent Perez admitted that Border Patrol conducts roving patrol stops on all vehicles making the turn from U.S. Highway 59 onto FM 2050. Considering this admission in light of all the other relevant facts and circumstances involved here, the Court finds the analysis provided in Defendant's objection to the [report and recommendation] persuasive. To be clear, the Court does not hinge its decision solely on Agent Perez's admission; this is merely one aspect taken into consideration. Ultimately, on *de novo* review, the Court agrees with Defendant's examination of the *Brignoni–Ponce* factors under the particular facts of the case.

In his objection to the report and recommendation of the magistrate judge, Freeman analyzes each *Brignoni–Ponce* factor in isolation despite the Supreme Court's admonishment against a "divide-and-conquer analysis," *Wesby*, 138 S. Ct. at 588 (quoting *Arvizu*, 534 U.S. at 274), or an "excessively technical dissection," *id.* (quoting *Gates*, 462 U.S. at 234). Reviewing each factor separately, Freeman avers that none of the evidence "weigh[s] in favor of reasonable suspicion."[9] As the government correctly asserts, "Freeman's objections to the [report and recommendation] marched through the various

---

[9] Examples include (1) "that the vehicle was in close proximity to the border should not weigh in favor of a finding of reasonable suspicion in this case"; (2) "that Mr. Freeman's vehicle was registered out of Houston, and that FM 2050 was not a direct route to Houston, should not weigh in favor of reasonable suspicion"; (3) "that Mr. Freeman's truck was not registered to a business should not weigh in favor of a reasonable suspicion"; (4) "BPA Perez's experience should not weigh in favor of reasonable suspicion"; (5) "BPA Perez's determination of the Defendant's speed and 'erratic driving' should not weigh in favor of reasonable suspicion"; (6) "Mr. Freeman's act of looking at the side-view mirror or weaving cannot be considered as suspicious . . . ."; and (7) "[t]he remaining *Brignoni–Ponce* factors are not applicable in this case."

25

factors relied upon by the magistrate judge and essentially argued that each individual factor, standing alone, could not give rise to reasonable suspicion." The Supreme Court precisely rejected that method of analysis:

> We think that the approach taken by the [Court of Appeals] here departs sharply from the teachings of these cases. The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances,' as our cases have understood that phrase. The court appeared to believe that each observation by [the Border Patrol Agent] that was by itself readily susceptible to an innocent explanation was entitled to 'no weight.'

*Arvizu*, 534 U.S. at 274.

Because Freeman, and consequently, the district court, failed properly to review the *Brignoni–Ponce* factors based on the totality of the circumstances, the majority should have reversed the suppression ruling and correctly applied the relevant legal test.

## C.

Unfortunately, the majority commits the same mistake as the district court, engaging in an excessively technical dissection and failing faithfully to adhere to Supreme Court precedent, including *Arvizu* and *Wesby*. The majority thus commits two errors.

First, it "view[s] each fact 'in isolation, rather than as a factor in the totality of the circumstances.'" *Wesby*, 138 S. Ct. at 588. Although the majority claims that it examines the factors as a laminated total, in reality it marches through the *Brignoni–Ponce* factors one-by-one before hastily concluding that "these facts, without more, are not enough to support reasonable suspicion, especially when viewed through the eyes of an agent with minimal experience detecting illegal activity." The majority does not analyze the factors in conjunction with one another and thus fails to "recognize that the whole is often

greater than the sum of its parts—especially when the parts are viewed in isolation." *Id.* "Instead of considering the facts as a whole," the majority takes them "one by one." *Id.* "The totality-of-the-circumstances test 'precludes this sort of divide-and-conquer analysis.'" *Id.* (quoting *Arvizu*, 534 U.S. at 274).

Second, as was the case in *Wesby*, the majority "believe[s] that it [can] dismiss outright any circumstances that [are] 'susceptible of innocent explanation.'" *Id.* Of course, "[a] factor viewed in isolation is often more 'readily susceptible to an innocent explanation' than one viewed as part of a totality." *Id.* at 589 (quoting *Arvizu*, 534 U.S. at 274).

For example, with respect to the particular aspects or characteristics of the vehicle, the majority—viewing the factor in isolation—inexplicably concludes that "Agent Perez did not find the temporary plates to be suspicious." Such a conclusion is directly contradicted by Perez's testimony.

The majority's mental gymnastics continue when it finds that paper plates do not contribute to reasonable suspicion if a check on the plate turns up current information. This finding flatly ignores Perez's concern that Freeman's white pickup, a common oilfield vehicle in the area, was registered to a person in Houston instead of to a company. The majority, unsurprisingly, fails to address this piece of evidence. It then makes the bald assertion that this court cannot assume that it is suspicious to take an indirect route to where a vehicle is registered—a contention contradicted by both Supreme Court and Fifth Circuit precedent.[10]  Certainly, an indirect route, standing alone, would not be enough to justify a finding of reasonable suspicion, but when viewed alongside several other pieces of evidence through the lens of an experienced

---

[10] *Compare Arvizu*, 534 U.S. at 269, 271–72, 277, *and Zapata–Ibarra*, 212 F.3d at 879, 883–84, *with United States v. Escamilla*, 560 F.2d 1229, 1232 (5th Cir. 1977).

Border Patrol agent, it quickly becomes sufficient.  And therein lies the majority's error, a mistake it repeats throughout its opinion.

Ultimately, "[t]he circumstances here certainly suggested criminal activity." *Wesby*, 138 S. Ct. at 589.  An experienced agent headed out to investigate a truck that he did not recognize.  The pickup was first spotted within fifty miles of the border, traveling northwest toward Houston.  This is a paramount factor when reviewing an officer's reasonable suspicion determination near the border.  The pickup then turned right off Highway 59, thereby avoiding the checkpoint, and onto FM 2050, where—in a reversal of direction—it began heading due south away from Houston.  FM 2050 is sparsely populated with no retail businesses.  Such a deviation adds roughly an hour to the trip from Laredo to Houston.  The area in question is well-traveled by smugglers of illegal aliens and narcotics.

After catching up with the Freeman's vehicle, Perez noticed that it was fitted with a paper license plate, a tactic often used by smugglers to avoid inspection or suspicion.  After his partner checked the vehicle's plate, they determined that it was registered to an individual in Houston, unlike most pickup trucks in the area, which are registered to oil-and-gas companies.  Meanwhile, Freeman repeatedly checked his rearview mirror, drifting from side to side, and appeared to be nervous.  At one point, Freeman drove off the road by taking the inside corner of a turn.

"Undoubtedly, each of these factors alone is susceptible of innocent explanation, and some factors are more probative than others." *Arvizu*, 534 U.S. at 277.  Taken together, however, "they sufficed to form a particularized and objective basis for [Perez's] stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment." *Id.* at 277−78.

Accordingly, "[c]onsider[ing] the totality of the circumstances and

No. 17-40739

giv[ing] due weight to the factual inferences drawn by [Perez]," *id.* at 277, the majority should have held that Perez "had reasonable suspicion to believe that [Freeman] was engaged in illegal activity." *Id.* "It was reasonable for [Perez] to infer from his observations, his registration check, and his experience as a border patrol agent," *id.*, that Freeman turned right onto FM 2050—"a little-traveled route used by smugglers"—to circumvent the Freer checkpoint. *Id.* The majority's determination otherwise, particularly when viewed in light of recent Supreme Court precedent, is undoubtedly curious.[11]

D.

The majority commits one final error by dismissing, as "largely irrelevant," the district court's failure to apply *Whren* faithfully. In *Whren*, 517 U.S. at 813, the Court determined that its precedent "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." Consequently, an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.*

The district court stated that it based its decision on Perez's admission "that Border Patrol conducts roving patrol stops on all vehicles making the turn from U.S. Highway 59 onto FM 2050." The court qualified that statement—maybe an implicit acknowledgement of *Whren*—by noting that it did "not hinge its decision solely on Agent Perez's admission; this is merely one aspect taken into consideration." But when read in context, *Brignoni–Ponce*

---

[11] "[T]he right to be free from unwarranted police intrusion does not completely dissipate near the border." *Garza*, 727 F.3d at 443–44 (Elrod, J., dissenting). But this case is not, as the majority claims, "closely analogous" to *Rangel–Portillo*, 586 F.3d at 380–81. In that case, we could not "conclude that an agent has reasonable suspicion to conduct a stop anytime an individual is sweating while riding in a vehicle in close proximity to this nation's southern border." *Id.* at 382. Such facts are hardly analogous to those at issue here.

eschews such an approach.

As the government correctly highlights, "[w]hether the Border Patrol routinely pulls over every car turning right down FM 2050 is irrelevant so long as the stop is objectively supported by reasonable suspicion." Moreover, we have consistently affirmed that an officer's subjective state of mind is irrelevant for purposes of the Fourth Amendment, provided that "the circumstances, viewed objectively, justify the action."[12] Viewed objectively, the evidence provided the reasonable suspicion necessary for Perez to stop Freeman's vehicle. Because the district court, at least in part, erroneously based its decision to suppress on its perception of Perez's subjective motivations, the court committed reversible legal error.

## II.

It is obvious that the majority's decision—and that of the district court— were influenced by Perez's candid admission that border patrol agents at the Freer checkpoint conduct roving stops on all vehicles turning onto FM 2050. Regardless of whether that practice, official or unofficial, is good public policy, we are bound by the Supreme Court's repeated insistence that an officer's subjective motives play no role in whether he violated the Fourth Amendment.

We must focus, therefore, on whether Perez had reasonable suspicion to believe that Freeman was engaged in illegal activity. Ultimately, the record plainly supports such a finding. I respectfully dissent.

---

[12] *E.g., United States v. Lopez–Moreno*, 420 F.3d 420, 432 (5th Cir. 2005); *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997); *see also Scott*, 436 U.S. at 138 ("[T]hat the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.").